# R.D. *vs.* A.H.

Suffolk. May 7, 2009. - September 11, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Parent and Child,* Custody. *Probate Court,* Custody of child, Guardian, Findings by judge. *Evidence,* Child custody proceeding, Judicial discretion. *Minor,* Custody. *Guardian. Statute,* Construction. *Practice, Civil,* Stay of proceedings. *Words,* "Parent," "Unfitness."

In a custody dispute between a legal parent and a de facto parent, the judge correctly ruled that the de facto parent, in seeking appointment as permanent guardian with custody, had the burden of proving by clear and convincing evidence that the legal parent was legally unfit [710-715], and the judge's conclusion that the de facto parent had not proven the legal parent's unfitness was supported by evidence in the record [716-719].

In a custody dispute, the probate judge did not abuse her discretion in excluding certain evidence, where the proponent had failed to place it on the trial exhibit list and was permitted to testify to her memory of the exhibit's contents. [719]

General Laws c. 215, § 22, did not require a probate judge automatically to stay the judgment in a custody dispute pending appeal. [719-720]

PETITION filed in the Suffolk Division of the Probate and Family Court Department on December 8, 2003.

The case was heard by *Elaine M. Moriarty,* J., and postjudgment motions were considered by her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Samuel Adams* (*Kristin Davis* with him) for R.D.

*Karen L. Loewy & Mary L. Bonauto,* for Gay & Lesbian Advocates & Defenders, amicus curiae, submitted a brief.

*Lynn Girton & Veronica Serrato,* for Raising Our Children's Children, amicus curiae, submitted a brief.

BOTSFORD, J. This case concerns a custody dispute between the plaintiff, R.D., who has been a de facto parent of the child, Thomas (pseudonym), for much of the child's life, and the defendant, A.H., the child's biological father. After a thirteen-

day trial, a judge in the Probate and Family Court (Probate Court) denied R.D.'s petition to be appointed permanent guardian with custody, finding that A.H. was not unfit and was therefore entitled to the custody of his son. R.D. appeals. She argues that (1) in a custody dispute between a legal parent and a de facto parent, custody should be awarded on the basis of the best interests of the child, regardless whether the legal parent is fit, and that appointing her as permanent guardian of the child is in the child's best interests; (2) in any event, she should be awarded custody in accordance with G. L. c. 209C, § 10 (*a*), a statute that concerns in part issues of custody in relation to children born out of wedlock; (3) the trial judge committed reversible error in excluding a tape recording of telephone messages left by A.H. on R.D.'s answering machine; and (4) the judge erred in failing to grant R.D. an automatic stay when she filed her notice of appeal in the Probate Court, and in denying her motion to stay. We transferred the case to this court on our own motion. We conclude that under the governing guardianship statute, G. L. c. 201, § 5, a legal parent is entitled to custody unless determined to be unfit, and that a determination of a legal parent's fitness necessarily includes a consideration whether the legal parent is fit to further the best interests of the child. We also conclude that the judge's finding that A.H. was not currently unfit is not clearly erroneous and that R.D.'s claims concerning the tape recorded telephone messages and an automatic stay of the judgment lack merit. Accordingly, we affirm the judgment and postjudgment orders of the Probate Court.[1]

1. *Background.* This case has a long and tortuous history, the full details of which are unnecessary to recite. The child was born on October 28, 1998. His biological parents, who were never married, are A.H. and R.P. (mother). For the first fourteen months of the child's life, he lived with various relatives and occasionally with his mother.

A.H. and R.D. met in the spring of 1998 through their church. In the fall of 1998, A.H. moved into R.D.'s apartment and began an intermittent relationship with her that lasted in some form

---

[1]We acknowledge the amicus briefs filed in support of R.D. on behalf of Gay and Lesbian Advocates & Defenders and Raising Our Children's Children. A.H. did not file a brief or argue before this court.

until April, 2004. The relationship was volatile and included some acts of domestic violence by A.H. In late 1999, for example, A.H. pleaded guilty to charges of assault and battery and threats against R.D. At trial in this case, R.D. testified to multiple acts of domestic violence and abuse against her by A.H.

In early 2000, A.H. brought the child to live with him in R.D.'s apartment. On January 18, 2001, A.H. was granted sole legal and physical custody of the child in an action that he brought against R.P. in the Probate Court. On May 7, 2002, A.H. and R.D. filed a joint petition for the adoption of the child; R.P. opposed the adoption. A pretrial conference in the adoption matter was held in April, 2003, and a trial was scheduled for December 8, 2003. That trial did not take place, however, because on December 5, A.H. took the child with him to Florida. In response to this action by A.H., R.D. on December 8 filed a petition in the Probate Court for permanent guardianship of the child pursuant to G. L. c. 201, § 5, along with an ex parte motion to be appointed temporary guardian.[2] The judge appointed R.D. temporary guardian with custody pursuant to G. L. c. 201, § 14, for a period of three months, and ordered A.H. to surrender the child to R.D., with the proviso that A.H. could be heard on the issue of custody on forty-eight hours' notice. The child was thereafter surrendered to R.D.'s custody, and between December 8, 2003, and June 8, 2004, A.H. agreed to extend R.D.'s temporary guardianship on two separate occasions.[3] A.H.'s agreement, however, ended in June, 2004, when he filed a motion to terminate the guardianship and to relocate with the child to Florida, where his parents and other family members lived. The judge denied the motion, appointed a guardian ad litem (GAL) to represent the child's interests, and scheduled a pretrial conference for September, 2004.

The trial on the guardianship petition did not begin until

[2]The December 8, 2003, petition for guardianship is the petition at issue in this appeal.

[3]On December 11, 2003, soon after she filed the guardianship petition, R.D. petitioned the Probate and Family Court (Probate Court) for an abuse prevention order pursuant to G. L. c. 209A against A.H., which another judge in the Probate Court issued. A.H. was ordered to have no contact with either R.D. or the child. On December 23, 2003, the parties entered a written agreement to modify the c. 209A order to permit A.H. reasonable visitation with the child and contact with R.D. on advance notice.

November 30, 2005. In the intervening time, R.D.'s appointment as temporary guardian remained in effect, although A.H. filed motions to terminate it. In April, 2005, A.H. took the child to Florida, ostensibly for a one-week vacation to which R.D. had consented, but A.H. did not return the child at the appointed time. Armed with an order of the Probate Court to return the child to her, R.D. filed an action in Florida to secure his return. A hearing was scheduled in Florida for May 24, 2005. In his pleadings in Florida, A.H. falsely represented that he was then entitled to sole custody of the child, attaching a copy of the January 18, 2001, order that awarded custody to him in his dispute with the mother but not informing the Florida court of the subsequent order appointing R.D. as the temporary guardian with custody. A.H. also misrepresented to the Florida court that Massachusetts had lost all jurisdiction in the case; in fact, A.H. was in Florida with the child only by virtue of R.D.'s and the Probate Court's assent. The child was ordered to be surrendered to R.D. by the Florida court and was returned to her on May 24, 2005.

During the course of the various proceedings in the Probate Court relating to A.H., R.D., and the child, the judge appointed four separate GALs: the first in April, 2003, to represent the child's best interests relating to the adoption petition filed by R.D. and A.H.; the second in June, 2004, to represent the child in connection with R.D.'s guardianship petition and A.H.'s efforts to terminate R.D.'s temporary guardianship; the third in July, 2005, to determine whether the child's psychotherapist or social worker privilege, or both, should be waived to enable privileged testimony and reports to be admitted in evidence at trial, see *Adoption of Diane*, 400 Mass. 196, 201-202 (1987); and the fourth in July, 2005, as well, to report on issues of custody and visitation in connection with the guardianship petition. The GAL appointed in relation to the adoption petition, who filed her report in June, 2003, recommended that the adoption be allowed but noted her concern that both A.H. and R.D. "play very loose with the facts." The GAL first appointed in connection with the guardianship petition recommended in or around April, 2005, that the child be returned immediately to A.H.[4] The other GAL ap-

---

[4]The record does not contain any report by this guardian ad litem (GAL); his recommendation is referred to by the judge in her memorandum of decision.

pointed to review custody and visitation issues filed an extensive report in November, 2005, in which she also recommended that the child be placed with A.H., because in her view that placement "seems to provide a higher chance for success."[5]

The guardianship petition was tried over thirteen days in late 2005 and early 2006. On July 21, 2006, the judge issued a memorandum of decision that included a recapitulation of the procedural case history in the Probate Court and extensive factual findings concerning R.D., A.H., and the child's interests. She found that R.D. had been the primary caretaker of the child for a number of years and was a de facto mother to the child. She also found, however, that A.H. had been consistently involved in the child's life, had actively participated in his care when living with R.D. and the child, and loved the child. She ultimately concluded that R.D. had not proved A.H. was currently unfit as a parent, and that A.H. was therefore entitled to custody. Accordingly, she dismissed R.D.'s guardianship petition and awarded sole legal and physical custody of the child to A.H. with visitation rights to R.D. She ordered that the child was to be returned to A.H. "one week before the start of school in Florida." She also ordered that "[R.D.] shall have the right to visit with the child in Massachusetts for one week of school vacation and for one month in the summer."

R.D. moved twice to stay the judgment pending appeal. The judge denied both motions. She noted in her order denying the second motion, dated November 16, 2006, that A.H. was now living in New Hampshire, and she ordered the Probate Court's probation department to arrange for the location of a clinician in that State who could oversee the transition of the child to A.H.[6]

2. *Discussion*. a. *Parental fitness and custody*. The judge

---

[5]The GAL appointed to consider waiver of privileges filed a report waiving both privileges. At trial, the child's psychiatrist testified. Evidence of the opinions of social workers who had served as therapists for the child was also introduced.

[6]We take from this order of the judge that the child was not returned to A.H.'s custody one week before school started in the 2006-2007 academic year. Information in the record suggests that the transfer of the child to A.H.'s custody was delayed because of continuing hostility between A.H. and R.D., and a perceived need for the child to have more transition time and services. The record contains no further information, however, about A.H.'s apparent move to New Hampshire.

ruled that in seeking appointment as permanent guardian with custody, R.D. carried the burden of proving by clear and convincing evidence that A.H. was "legally unfit" to parent the child. R.D.'s principal claim in this case is that the judge applied the incorrect legal standard. Because the judge specifically found that R.D. qualified as a de facto parent of the child, R.D. argues that the judge was required to determine the question of custody by focusing solely on a determination of the child's best interests. She contends that this standard flows from our decisions recognizing the role of de facto parents, see, e.g., *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 829-834, cert. denied, 528 U.S. 1005 (1999); *Youmans* v. *Ramos*, 429 Mass. 774, 781-785 (1999); is supported by the American Law Institute's Principles of the Law of Family Dissolution (2002), "from which our own de facto parent principles derive," *A.H.* v. *M.P.*, 447 Mass. 828, 839 (2006); and is also required by G. L. c. 209C, § 10, which concerns the custody of children born to parents who are not married. The argument fails.

R.D. brought her petition to be appointed permanent guardian of the child under G. L. c. 201, § 5,[7] which provides in relevant part:

> "The guardian of a minor child shall have the custody of his person and the care of his education, except that the parents of the minor . . . shall have such custody and said care unless the court otherwise orders. The probate court may, upon the written consent of the parents . . . order that the guardian shall have such custody; and may so order if . . . it finds such parents . . . unfit to have such custody . . . ."

The language of this section makes clear, as the judge recognized, that in a dispute between a person seeking to become a child's guardian and a legal parent of a child, custody belongs to the legal parent, unless the parent is found to be unfit.[8] See, e.g., *Bezio* v. *Patenaude*, 381 Mass. 563, 570, 576 (1980);

---

[7]Effective July 1, 2009, G. L. c. 201, § 5, has been effectively replaced by G. L. c. 190B, § 5-204 (*a*), inserted by St. 2008, c. 521, § 9. See St. 2008 c. 521, § 44. Nevertheless, we consider here only G. L. c. 201, § 5, because it was in effect at all times relevant to this case.

[8]R.D. does not discuss or even cite to G. L. c. 201, § 5, in her brief on

*Guardianship of Estelle*, 70 Mass. App. Ct. 575, 578 (2007). See also *Kauch, petitioners*, 358 Mass. 327, 330 (1970) ("The settled law, founded on express legislative policy and uniformly adhered to by this court, is that a parent is not to be deprived of the custody of his child in the absence of a finding that he is unfit"); *Richards* v. *Forrest*, 278 Mass. 547, 552-554 (1932).[9] The judge was therefore correct in placing the burden on R.D., as the proposed permanent guardian, to establish A.H.'s unfitness; she was also correct that the standard of proof R.D. was obligated to meet was one of clear and convincing evidence. See *Custody of a Minor*, 389 Mass. 755, 766-767 (1983), citing *Santosky* v. *Kramer*, 455 U.S. 745, 769-770 (1982).

R.D.'s reliance on *Youmans* v. *Ramos, supra*, and *E.N.O.* v. *L.M.M., supra*, both of which discuss de facto parents, is misplaced. In neither case did the Probate Court award custody to a de facto parent; in neither case did this court, in its decision on appeal, discuss the issue of custody. The *Youmans* case concerned a petition in equity brought by a biological father to obtain custody of his daughter and to terminate the guardianship of the child's maternal aunt. We considered in that case whether the Probate Court judge, after awarding custody to the father, had the equitable authority to order visitation between the child and her aunt who, we concluded, qualified as a de facto parent of the child. Even though no statute provided for such visitation, we held that the judge did have the equitable authority to order it. See *Youmans* v. *Ramos*, 429 Mass. at 781-785.[10]

---

appeal, which is surprising, given that her petition for guardianship was brought pursuant to that statute. Because R.D. seeks appointment as guardian, and because the statute counterposes the guardian and the parents or parent of a child, it is reasonable, at least in the context of this case, to interpret the term "parents" in c. 201, § 5, as referring solely to legal parents, and not to de facto parents.

[9] "It is now clear that 'the unfitness standard must be applied whenever the State seeks to terminate [a parent's] rights to the custody of [his or her] minor child[], whether the State proceeds under the care and protection statute (G. L. c. 119, §§ 23-29), the guardianship statute (G. L. c. 201, § 5), or the adoption statute (G. L. c. 210, § 3).' *Custody of a Minor*, [389 Mass. 755, 765 (1983)], quoting from *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. [573,] 589 [1981]." *Guardianship of Estelle*, 70 Mass. App. Ct. 575, 580-581 n.5 (2007).

[10] Similarly, in *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 827-828, 830, cert. denied, 528 U.S. 1005 (1999), a case involving a same-sex couple who had decided

Nor is R.D. aided by her reliance on G. L. c. 209C, § 10.[11,12] Chapter 209C of the General Laws, entitled, "Children Born

together to become parents of a child and then separated from each other at some point after the child was born to one of them, we held that a Probate Court judge had the equitable power to order visitation between the nonbiological parent and the child over the biological parent's objection in the absence of direct statutory authority, where the plaintiff had been a de facto parent to the child for some time. Cf. *A.H.* v. *M.P.*, 447 Mass. 828, 838-842 (2006) (upholding trial judge's dismissal of complaint of former partner of biological mother seeking custody and visitation where judge's finding that plaintiff did not qualify as de facto parent was supported by evidence).

[11]General Laws c. 209C, § 10, provides in pertinent part:

> "(*a*) Upon or after an adjudication or voluntary acknowledgment of paternity, the court may award custody to the mother or the father or to them jointly or to another suitable person as hereafter further specified as may be appropriate in the best interests of the child.

> "In awarding custody to one of the parents, the court shall, to the extent possible, preserve the relationship between the child and the primary caretaker parent. . . .

> "(*c*) If either parent is dead, unfit or unavailable or relinquishes care of the child or abandons the child and the other parent is fit to have custody, that parent shall be entitled to custody.

> "(*d*) *If a person who is not a parent of the child requests custody, the court may order custody to that person if it is in the best interests of the child and if the written consent of both parents or the surviving parent is filed with the court. Such custody may also be ordered if it is in the best interests of the child and if both parents or the surviving parent are unfit to have custody or if one is unfit and the other files his written consent in court* [emphasis added].

> "(e) In issuing any temporary or permanent custody order, the probate and family court shall consider evidence of past or present abuse toward a parent or child as a factor contrary to the best interest of the child. . . . For the purposes of this section, 'abuse' shall mean the occurrence of [domestic abuse] between a parent and the other parent or between a parent and child . . . . A probate and family court's finding by a preponderance of the evidence, that a pattern or serious incident of abuse has occurred shall create a rebuttable presumption that it is not in the best interests of the child to be placed in sole custody, shared legal custody, or shared physical custody with the abusive parent. Such presumption may be rebutted by a preponderance of the evidence that such custody award is in the best interests of the child. For the purposes of this section, an 'abusive parent' shall mean a parent who has committed a pattern of abuse or a serious incident of abuse."

[12]In *Youmans* v. *Ramos*, 429 Mass. 774, 780 (1999), we stated that G. L.

Out of Wedlock," begins with the following statement of purpose in § 1:

> "Children born to parents who are not married to each other shall be entitled to the same rights and protections of the law as all other children. It is the purpose of this chapter to establish a means for such children either to be acknowledged by their parents voluntarily or, on complaint by one or the other of their parents or such other person or agency as is authorized to file a complaint by section five, to have an acknowledgment or adjudication of their paternity, to have an order for their support and to have a declaration relative to their custody or visitation rights ordered by a court of competent jurisdiction."

This statement of purpose explicitly applies to this "chapter" — i.e., G. L. c. 209C in its entirety — and the text of the statement makes it evident that the term "parent" refers to a biological parent. Furthermore, given the general interpretive rule that "where words are used in one part of a statute in a definite sense, they should be given the same meaning in another part of the statute," *Beeler* v. *Downey*, 387 Mass. 609, 617 (1982), we start from the premise that G. L. c. 209C, § 10, also uses the term "parent" to mean biological parent. In our view, the language and structure of § 10 (see note 11, *supra*) support this premise. Accordingly, we construe the term "parent" in § 10 to mean biological parent.

In light of this construction of the word, R.D. is not correct that G. L. c. 209C, § 10 (*a*), applies to someone in her position, that is, a person who is not a biological parent. It is § 10 (*d*), rather than § 10 (*a*), that is potentially applicable to R.D., because she is "a person who is not a parent of the child [who] requests custody." And as § 10 (*d*) expressly states, a judge may order that custody be given to such a person only in two situations: either when it is in the child's best interests *and* the child's

---

c. 209C had "no application" to the case. As discussed *supra*, the issue in the *Youmans* case was visitation; there was no challenge on appeal to the judge's award of custody to the father. In contrast, the principal issue here is the judge's decision on custody, not visitation (which the judge ordered). In this case, for reasons set forth *infra*, we conclude that G. L. c. 209C, § 10 (*d*), appears theoretically applicable, although R.D. did not bring her petition under that statute.

parents or surviving parent consents; or when it is in the child's best interests *and* the parents or surviving parent is determined to be "unfit." See *C.M.* v. *P.R.*, 420 Mass. 220, 223 n.6 (1995). Neither of these situations applies in the present case.[13]

In the context of a custody determination, however, it is essential to recognize that the determination whether a parent is "unfit" is closely intertwined with a consideration of the best interests of the child. The issue is not whether the parent is "unfit" in some abstract sense. "Significantly . . . the term 'unfitness' signifies something more than a standard by which we measure the limits of acceptable parental conduct. The term is a standard by which we measure the circumstances within the family as they affect the child's welfare." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 589 (1981). "[T]he critical question is whether the natural parents are currently fit to further the welfare and best interests of the child." *Bezio* v. *Patenaude*, 381 Mass at 576. "[T]he word 'unfit' includes 'the conception of being unsuitable or ill adapted to serve under the existing circumstances . . . , and this is to be adjudged with reference primarily to the welfare of the child.' " *Hirshson* v. *Gormley*, 323 Mass. 504, 507 (1948), quoting *Cassen* v. *Cassen*, 315 Mass. 35, 37 (1943). "At a minimum, the fitness of a particular parent cannot be judged without a consideration of that parent's willingness and ability to care for the child, as well as the effect on a child of being placed in the custody of that parent. One who is fit to parent in some circumstances may not be fit if the circumstances are otherwise. A parent may be fit to raise one child but not another." *Guardianship of Estelle*, 70 Mass. App. Ct. 575, 581 (2007). See *Richards* v. *Forrest*, 278 Mass. at 551, 553-554.[14]

---

[13]Again because R.D. is not a biological parent of the child in this case, her claim that the judge erred in not applying the statutory rebuttable presumption set forth in G. L. c. 209C, § 10, namely, that it is not in the best interest of a child to be placed in the custody of a (biological) parent who has engaged in domestic abuse of the other (biological) parent or the child, also fails. Moreover, it bears noting that while the judge declined to apply the rebuttable presumption directly in this case because it did not involve a custody dispute between biological parents, she did consider "the principles and policies set forth in" § 10, and discussed at some length in her decision the allegations and evidence of domestic abuse by A.H. that R.D. presented and the impact of such abuse on the child.

[14]In *Guardianship of Estelle*, 70 Mass. App. Ct. 575, 579-580 (2007), a

R.D. also criticizes, as against the weight of the evidence, the judge's conclusion that R.D. did not prove A.H.'s unfitness. We disagree. The judge's decision and findings within it reflect that she considered the question whether A.H. was "unfit" by applying the standard that we have just discussed. She noted generally that both parties had "very serious credibility issues."[15] She stated that R.D.'s allegations of domestic violence were her "strongest concern in determining Father's [A.H.'s] fitness to care for child," but she found that, on the issue of R.D.'s allega-

case that involved a custody dispute between a child's biological father and relatives who had served as the child's temporary guardians for many years, the Appeals Court correctly described the interrelationship between unfitness and the child's best interests as follows:

> "Fitness is not merely the absence of abuse or neglect; nor is it a set of abilities or characteristics that are the same in all circumstances. On the one hand, we defend the right of a parent to the custody of his or her child, yet we recognize that the right will not be enforced if it results in harm to the child, in other words, if the parent is 'unfit.'. . . At the same time, the 'best interests of the child' is the touchstone of the analysis. . . . The question, then, is how to balance a parent's capacity to care adequately for a child (i.e., his or her 'fitness') with that child's 'best interests,' given the child's current circumstances. It has been stated that 'the tests "best interests of the child" in the adoption statute and "unfitness of the parent" in the guardianship statute reflect different degrees of emphasis on the same factors, that the tests are not separate and distinct but cognate and connected.' *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, [367 Mass. 631, 641 (1975)]. 'Neither the "parental fitness" test nor the "best interests of the child" test is properly applied to the exclusion of the other.' *Bezio* v. *Patenaude*, [381 Mass. 563, 576-577 (1980)]. 'The term ["unfitness"] is a standard by which we measure the circumstances within the family as they affect the child's welfare.' *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 589 (1981)."

[15]The judge found, for example, that R.D., who was aged fifty-seven at trial, "frequently used a date of birth for official purposes and throughout these proceedings of 1968, thereby listing her age as 20 years younger than she actually is and much closer to [A.H.'s] age of 30." The judge also found that R.D. has used more than one Social Security number and that she had done so knowing that it was improper. The judge found that A.H. was not credible when he asserted that he did not know that he could have contested the guardianship when he appeared before the court on December 23, 2003. She also specifically disbelieved his testimony concerning the reasons he did not return the child to the guardian in April and May, 2005 — after he had taken the child to Florida.

tions of abuse, R.D. was not a credible and reliable witness. The judge noted that R.D. had "expressed no [domestic abuse related] safety concerns about [A.H.'s] conduct toward her or child" prior to his decision not to proceed with the adoption petition. She found further that "[w]hile [A.H.] denies domestic violence, Father admitted to pushing Guardian [R.D.] on more than one occasion to DSS [Department of Social Services] and [stated] that he was trying to get help (for himself)." She also found that "the domestic violence, to the extent it existed, was between the parties; that [A.H.] has undergone anger management . . . ; that with parties living in two different states the opportunity for continued violence is very significantly reduced; and that [A.H.] has not been violent to child and . . . he loves child." The judge concluded that "there has been some domestic violence between the parties and that child on some occasions has witnessed the same," but that "[a]ny violence [child] has witnessed has not had an adverse effect on child to the extent that it would preclude an award of custody to [A.H.]."

With respect to the issue of A.H.'s fitness or unfitness, the judge also found the following: (1) "since assuming the care of child at age 14 months, until entry of restraining order [on] about December 11, 2003, [A.H.] has had significant involvement with child and active participation in his educational and medical care"; (2) "[A.H.] has been a continuing presence in child's life since child was 14 months old"; (3) [A.H.] "has attempted to maintain telephone contact with child throughout this litigation which efforts have not always been supported by [R.D.]"; (4) "[A.H.] has married, obtained an apartment with his new spouse, and obtained employment"; (5) supervised visits with [A.H.] "have gone well"; and (6) two of the three GALs who have seen the father interact with the child "recommended an immediate return of child to [A.H.]."[16] The judge stated: "While I do not find [A.H.] and child have the strongest bond,

---

[16] The two GALs who made this recommendation were those appointed in 2004 and 2005 to consider the issue of custody after R.D. had been appointed temporary guardian with sole physical custody of the child. The third GAL to whom the judge was apparently referring was the one appointed in 2003 to consider the issue of adoption by R.D. at a time when R.D. and A.H. had jointly filed the petition for adoption and were living together with the child. That GAL had no reason to consider whether the child's interests would be

given their limited contact since 2004, I do find child knows his father, loves his father, is not fearful of father and seemingly has a good time with father." She further noted that "[A.H.] has a long history of non cooperation with the Court," including his conduct in relation to the proceedings in Florida. She concluded, however, that the "[c]hild should not be punished by [A.H.]'s failure to have complied with this Court's order [to return the child to R.D.] where . . . he would be best off in [A.H.]'s custody."

With respect to R.D. and her relationship with the child, the judge found that R.D. had been the child's primary caregiver since he was fourteen months old, and that she "genuinely loves the child and . . . considers herself to be (and wishes she were) [his] mother." The judge also found that the child was "quite attached" to R.D.; the child sees R.D. as his mother; and R.D. is a "de facto parent" of the child. She further found, however, that at times R.D. did not follow through with recommendations for speech therapy for the child; his home schooling, supervised by R.D., "leaves child somewhat isolated"; and R.D. herself appears "somewhat isolated." The judge noted that it would be "very difficult emotionally for child" to experience a "complete separation from [R.D.]." The judge has "weighed carefully the upset child will face by being transferred to [A.H.'s] custody . . . . However, child is young, knows his father, has the foundation of a good relationship with him and should be able to make the transition to [A.H.'s] care with the support of professional counseling." At the same time, she concluded that it would be in the child's best interests to remain in contact with R.D., and included an order for weekly telephone contact and visitation in the final judgment.

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Mass. R. Dom. Rel. P. 52 (a) (2009). The judge's finding that R.D. has not shown by clear and convincing evidence that A.H. was unfit was not clearly erroneous. See *Custody of Eleanor*, 414 Mass. 795, 799 (1993), quoting *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977) ("A finding is clearly er-

---

better served by being placed with either R.D. or A.H. individually, rather than with both of them.

roneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed' "). Each of the judge's findings was supported by evidence in the record. "It is within the judge's discretion to evaluate the credibility of witnesses and to make [her] findings of fact accordingly." *Care & Protection of Three Minors*, 392 Mass. 704, 711 (1984).

b. *Other issues.* (i) *Exclusion of telephone message tape recording.* R.D. argues that the judge committed reversible error in excluding a tape recording of an answering machine message R.D. claims was left by A.H. on R.D.'s telephone in April, 2004. R.D. testified that she had not put the tape recording on the trial exhibit list because she thought the judge had ruled that all tapes were inadmissible. The judge stated, "I am not inclined to admit [the tape] . . . if it was not on the exhibit list." However, the judge allowed R.D. to testify as to her memory of the contents of the recorded message. R.D. testified that A.H. stated, on the recording, "I swear . . . I never raped anyone before. . . . I swear to God that I will go to heaven and He will know that I never raped anyone before. Please believe me and forgive me." A.H. denied ever leaving a message for R.D. in which he stated that he had never raped "anyone else."

There was no error. A trial judge has broad discretion with respect to the admission and exclusion of evidence. See *Cottam* v. *CVS Pharmacy*, 436 Mass. 316, 327 (2002); *Gonzalez* v. *Spates*, 54 Mass. App. Ct. 438, 445 (2002). In any event, R.D. was permitted to testify as to the alleged contents of the tape-recorded message. See *Silverman* v. *Spiro*, 438 Mass. 725, 736 (2003).

(ii) *The judge's denials of R.D.'s postjudgment motions.* R.D. further argues that the judge erred in failing automatically to stay the judgment on the filing of her notice of appeal and in thereafter denying her motion to stay. She claims that G. L. c. 215, § 22, requires that in proceedings in the Probate Court, an automatic stay of judgment pending appeal be entered.

General Laws c. 215, § 22, provides in relevant part that "[a]fter an appeal has been claimed and filed in the registry of probate, all proceedings in pursuance of the act appealed from shall, except as otherwise expressly provided, be stayed until

the determination thereof by the supreme judicial court or appeals court . . . ." This statute does not apply to a judgment and order concerning the custody of a child. The Rules of Domestic Relations Procedure "govern the procedure in the Probate and Family Court Department in all proceedings for . . . custody of minor children." Mass. R. Dom. Rel. P. 1. Under these rules "[u]nless the court otherwise orders, the filing of an appeal shall not stay the operation: . . . (ii) Of any other order or judgment of the court relative to custody . . . ." Mass. R. Dom. Rel. P. 62 (g) (ii). See *Huber* v. *Huber*, 408 Mass. 495, 498 (1990). Pursuant to this rule, the judge was authorized to stay the judgment concerning the child's custody, but she certainly was not required to do so. "Prompt resolution of custody issues is essential." *Custody of a Minor*, 389 Mass at 764. There was no error.

Accordingly, we affirm the judgment and the postjudgment orders of the Probate Court judge.

*So ordered.*