## GUARDIANSHIP OF CHEYENNE.[1]

No. 09-P-2117.

Hampden. June 9, 2010. - September 27, 2010.

Present: RAPOZA, C.J., SIKORA, & RUBIN, JJ.

*Parent and Child,* Custody. *Practice, Civil,* Guardianship proceeding, Findings by judge. *Evidence,* Child custody proceeding. *Minor,* Custody. *Guardian.*

In the circumstances of proceedings on a father's petition for removal of his child's guardian, clear and convincing evidence supported the Juvenile Court judge's determination that the father was unfit to parent the child and that it served the child's best interests to remain in the guardian's custody and care, with monthly visitation with the father, where the father's unfitness resulted from an authoritarian parenting style in conflict with the child's habitual defiant behavior, and from the continuing absence of a bond between the father and child, and where the presence of a bond between the child and her longtime guardian and the likely trauma of that bond's severance further defined the child's best interests. [829-832]

PETITION for guardianship filed in the Springfield Division of the Juvenile Court Department on September 28, 1999.

A petition for removal of guardian, filed on January 26, 2006, was heard by *Rebekah J. Crampton Kamukala,* J.

*Jacquelyn D. O'Brien* for the father.

*Raymond J. Rigat* for the child.

*Deborah W. Kirchwey* for the guardian.

SIKORA, J. This appeal concerns a Juvenile Court judge's denial of a father's petition for removal of his daughter's guardian pursuant to G. L. c. 201, § 5.[2] The judge found the father unfit to parent his daughter, concluded that she should remain

---

[1]A pseudonym.

[2]General Laws c. 201, § 5, was repealed by St. 2008, c. 521, §§ 21, 44. The statute was replaced by G. L. c. 190B, § 5-204(*a*), inserted by St. 2008, c. 521, § 9. As in *R.D.* v. *A.H.,* 454 Mass. 706, 711 n.7 (2009), we address only c. 201, § 5, because it was in effect at the relevant times in this case.

in the care and custody of her guardian, and ordered monthly visitation with the father. The father challenges the judge's finding of unfitness and her findings concerning his daughter's bond with the guardian. For the following reasons, we affirm.

*Background.* We summarize the facts from the judge's well supported findings. On May 20, 1998, Cheyenne was born in Springfield. The mother had become pregnant during a brief relationship with the father.[3] The father moved to Puerto Rico during the mother's pregnancy. Cheyenne's maternal great-aunt assumed responsibility for the child soon after she was born and became her permanent guardian in 2000.

In 2004, the father returned to Springfield. In 2005, he identified himself as Cheyenne's father to the guardian and expressed his wish to become acquainted with the child. The guardian agreed to a visit before Christmas. During that visit, Cheyenne did not talk to the father, although she interacted with his two sons.[4] The father requested more visits, but the guardian informed him that Cheyenne refused to see him and asked the father to confirm his paternity. In early 2006, deoxyribonucleic acid testing and a resulting adjudication established his paternity. The father promptly filed a petition to vacate Cheyenne's guardianship.

Soon afterward, the father and the guardian entered into an agreement for five visits to begin in February, 2006. Generally, the visits went poorly. On the first occasion, Cheyenne hid under the table and refused to interact with him. During other visits, she engaged reluctantly with the father. In April, 2006, the father and the guardian entered into mediation, during which the father met five more times with Cheyenne. Some of these visits were positive.

In May, 2007, Dr. Victor Carbone, a licensed psychologist, visited with the father, the guardian, and Cheyenne for a parenting evaluation. Although he observed little interaction between

---

[3]The father knew that the mother was pregnant but believed that the child was not his. The judge found that the father knew or should have known of the strong probability that the unborn child was his.

[4]The father's two sons are Cheyenne's half-brothers. The father had married. His wife had one young daughter, with whom Cheyenne would also interact. The trial court record contains no evidence of any deficiencies in the father's performance as a parent to his sons and his stepdaughter.

the father and daughter, Carbone recommended visitation. The father and the guardian entered into an agreement for weekly visits. Six or seven visits occurred, during which Cheyenne's reluctance to interact with the father continued. During one visit, Cheyenne refused to leave the guardian's vehicle, repeatedly locked its doors, and hid under the seats when they arrived at the father's home. On another visit, she again refused to leave the guardian's van. Consequently, Carbone recommended suspension of the visits and family therapy for the father and Cheyenne. Before the suspension, one more visit occurred, during which the father took Cheyenne with his children to have pictures taken: although Cheyenne gladly sat with the children, she refused to have her picture taken with the father.

The parties began family therapy in late 2007. The father secured the therapist. Over the course of six sessions with that therapist, Cheyenne became upset, moody, stressed, and angry. Carbone provided a list of other therapists.[5] The parties met with some of them. Cheyenne did not respond well to the process. At Carbone's suggestion, family therapy ceased until Cheyenne's personal therapist determined that she was ready to benefit from it.[6]

The judge credited Carbone's opinion (1) that no established relationship existed between Cheyenne and the father, despite the father's efforts to bond with her; (2) that she did not want to live with him and wanted to see him less frequently; (3) that she resisted discipline and coercion[7]; (4) that the father's transitional plan called for a complete change to Cheyenne's life and reflected his forceful style of parenting; (5) that the father's transitional plan would not improve his relationship with Cheyenne and that removal of her from the guardian's care would cause her great trauma; and (6) that, because Cheyenne did not yet trust the father, his attempts to acquire custody of her caused fear and further distrust of him. Furthermore, Cheyenne herself stated to the judge that she did not want to

---

[5]The guardian ceased therapy with the first therapist because the father had a pre-existing therapeutic relationship with her.

[6]Prior to the father's entry into her life, Cheyenne had worked with a therapist to help her with problems of in-school behavior, sleep, and aggression.

[7]The judge credited Carbone's diagnosis of oppositional defiant disorder for Cheyenne.

live with the father and that she preferred to continue living with the guardian.

Upon these findings, the judge ruled that the father was unfit to parent Cheyenne and that it served her best interests to remain in the care and custody of the guardian. The judge ordered monthly visitation with the father.

*Analysis.* The father contends (1) that the judge improperly found him unfit by reason of his failure to pursue his custodial rights until 2005; and (2) that the judge inadequately substantiated her findings of a "secure attachment" between the guardian and child and of a harmful impact upon Cheyenne from removal of the guardianship.

Under G. L. c. 201, § 5, "in a dispute between a person seeking to become a child's guardian and a legal parent of a child, custody belongs to the legal parent, unless the parent is found to be unfit."[8] *R.D.* v. *A.H.*, 454 Mass. 706, 711 (2009). While the "critical inquiry" in custody disputes is a finding of parental unfitness, a determination of the " 'best interests of the child' is the touchstone of the analysis." *Guardianship of Estelle*, 70 Mass. App. Ct. 575, 579, 580 (2007), quoting from *Adoption of Nancy*, 443 Mass. 512, 515 (2005). The tests of parental unfitness and the child's best interest "are not separate and distinct but cognate and connected." *Id.* at 580, quoting from *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975). Put differently, parental unfitness "is a standard by which we measure the circumstances within the family as they affect the child's welfare." *Ibid.* The burden of proof rests with the guardian to establish the father's unfitness by clear and convincing evidence. See *R.D.* v. *A.H.*, *supra* at 712. On appellate review,

---

[8]"The . . . court may, upon the written consent of the parents or surviving parent, order that the guardian shall have such custody; and may so order if, upon a hearing and after such notice to the parents or surviving parent as it may order, it finds such parents, jointly, or the surviving parent, unfit to have such custody; or if it finds one of them unfit therefor and the other files in court his or her written consent to such order. . . . The court may revoke the appointment of a guardian if the party petitioning for revocation proves a substantial and material change of circumstances and if the revocation is in the child's best interest." G. L. c. 201, § 5. The mother consented to the guardian's petition for custody of Cheyenne in 1999.

we determine whether the trial judge abused her discretion or committed a clear error of law. *Adoption of Elena,* 446 Mass. 24, 30 (2006).

Contrary to the father's first contention, the judge did not ground her finding of unfitness upon the father's earlier failure to exercise his custodial rights.[9] The judge carefully considered a variety of factors concerning the father's parental fitness for Cheyenne's needs.

Massachusetts law has long recognized the relativity of parental fitness. A parent may be fit to raise one child but unfit to rear another. See *Richards* v. *Forrest,* 278 Mass. 547, 553 (1932); *Petition of the Department of Public Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 589 (1981). No evidence indicated any deficiency in the father's performance as a parent to his two sons and his stepdaughter. The fitness of a particular parent will hinge upon both "consideration of that parent's willingness and ability to care for the child, as well as the effect on a child of being placed in the custody of that parent." *Guardianship of Estelle,* 70 Mass. App. Ct. at 581. In this instance, the judge assessed the father's parenting style as aggressive, strict, and authoritarian. That parental mode, she determined, would be ineffective and detrimental because Cheyenne was currently a defiant child resistant to discipline. With justification, she concluded that the father would be presently unable to parent Cheyenne.

The judge found also a lack of any bond between the father and Cheyenne. Even after three years of visits, mediation, and family therapy, she continued to resist the father's role and preferred not to live with him. The judge acknowledged the father's efforts to establish a bond with Cheyenne but accurately found them unsuccessful.

The judge weighed the role of the guardian. She found that the guardian had provided little or no assistance to the forma-

---

[9]The judge found that the father knew or should have known that Cheyenne was his child when the mother was pregnant. It was not, however, the ground of her ultimate finding of unfitness. The judge's subsidiary finding was not improper. See *Adoption of Jenna,* 33 Mass. App. Ct. 739, 744 (1992) ("Although . . . stale information cannot be the basis of current unfitness, prior parental conduct is deemed relevant in assessing the parent's capacity and ability to care for the child").

tion of a relationship between the father and daughter. However, the guardian's behavior had never advanced to active obstruction of the father's efforts to bond with his daughter. Cheyenne had lived with the guardian for ten years and had developed a firm bond with her. See *Guardianship of Estelle*, 70 Mass. App. Ct. at 581 (bonding of a child with a caretaker, while not dispositive, is a factor of weight in the ultimate balance of custody determinations). The judge concluded, upon the basis of Carbone's expert testimony, that Cheyenne would "suffer severe psychological trauma" if she were forced to leave the care and custody of the guardian. See *Bezio* v. *Patenaude*, 381 Mass. 563, 575 (1980) (a parent could be found unfit if returning custody to the parent is seriously detrimental to the welfare of the child).

Finally, the father argues that the judge failed to make sufficiently detailed findings of the bond between Cheyenne and the guardian. See *Adoption of Katharine*, 42 Mass. App. Ct. 25, 30-31 (1997) (where the bond between a child and her caretaker would be a decisive factor, findings must address the nature of the harm to the child from severance of that bond). The findings of the absence of a bond between the father and the daughter were ample. They reinforced the main finding of the father's particular unfitness to parent Cheyenne.

*Conclusion.* Clear and convincing evidence supports the judge's determination that the father, while "a good father to his two sons," does not presently fit the role of the father to Cheyenne. The unfitness results from a parenting style (authoritarian) in conflict with the child's habitual behavior (defiant) and from the continuing absence of a bond between father and daughter. The presence of a bond between the child and her longtime guardian and the likely trauma to her of its severance further define the child's best interests.[10]

The judge has provided for potential change. Her final orders require monthly visitation by the father, permit his sons and stepdaughter to accompany him, provide him with access to

---

[10]We emphasize that in this case the totality of these factors creates the determinations of unfitness and best interests. The clash of an authoritative parental practice with a child's opposition is not, by itself, the determinant of unfitness.

information of Cheyenne's health, school performance, and individual therapy, and authorize the eventual resumption of family therapy upon the recommendation of the individual therapist. The judge ruled correctly.

*Judgment affirmed.*