NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1172

ADOPTION OF FIONA (and two companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother and child Fiona appeal from decrees issued by a Juvenile Court judge terminating the mother's parental rights to her three children and approving the adoption plan proposed by the Department of Children and Families (DCF). We conclude that the trial judge properly found that the mother's untreated problems with substance use and refusal to engage in services, among other factors, establish her indefinite unfitness to parent any of the children. Concluding that, based on the evidence presented at trial, the judge acted within her

---

[1] Adoption of Andrea and Adoption of Braden. The children's names are pseudonyms. Andrea and Braden supported the termination of parental rights in the Juvenile Court and continue to do so on appeal. The putative father of the twins, Fiona and Andrea, filed a pleading surrendering any parental rights. The judge allowed his motion to withdraw as a party. All unknown and unnamed fathers were found unfit and their parental rights terminated. The putative father of Braden did not appeal the termination of his parental rights.

discretion in finding that freeing the children for adoption was in their best interests, we affirm the termination of parental rights.  Further concluding that the judge erred in approving DCF's adoption plan regarding Fiona where the social worker testified that DCF had not yet acquired the information necessary to determine the child's best interests, we reverse that approval and remand for further proceedings.

1.  Background.  The twin daughters, Fiona and Andrea, were born in 2011.  The mother missed medical appointments for the twins in December 2019 and May 2020.  The mother further failed to schedule or to attend necessary specialist appointment for either daughter.

In January 2021, DCF informed the mother that her case would be kept open until her children became medically up to date and their school attendance improved.  Given her "erratic" behavior, DCF social workers asked the mother to complete a drug screening test.  The mother refused, stating that she did not use drugs.

In February 2021, the mother told DCF social workers that she had been pregnant but no longer was.  The mother failed to provide any further information about the pregnancy at that meeting and declined services offered.  In fact, the mother was still pregnant.  On April 20, 2021, the mother again declined to complete a drug test, reiterating that she did not use drugs.

In May 2021, the mother delivered her fourth child, Braden, who tested positive for cocaine and opiates. The newborn experienced immediate and sustained withdrawal symptoms and was not discharged from the hospital until June 2, 2021. The mother also tested positive for cocaine and opiates, and police found illegal drugs and drug paraphernalia on her person after delivery. The mother later claimed that she used the drugs only to help with labor pains and denied being "a drug addict."

DCF social workers responded to the hospital and assumed emergency custody of the newborn. DCF also assumed emergency custody of the twins, who had been left unattended at home when the mother went to give birth and were unaware where the mother was.

When informed that her twin daughters had been placed in DCF custody, the mother stated that she did not want to see or speak with them until she regained custody. On May 13, DCF provided the mother with a thirteen-point department action plan, requiring the mother, inter alia, to engage in certain services, complete drug screens, sign all necessary releases, and complete a psychological and parental assessment. From May 2021 to her trial in November 2022, the mother failed to meaningfully comply with any of these tasks.

The mother refused to schedule visitation with her children until June 2021. From June 2021 through November 2023, the

3

mother attended fourteen in-person visits and nine or ten virtual visits. During that time, the mother confirmed and subsequently failed to attend nearly twenty other visits. Occasionally, the mother attempted to confirm visits at the wrong date or time or failed to confirm until after the mandated department deadline, resulting in no visitation. Based on the mother's lack of communication, DCF social workers were unable to schedule any home visits following April 2021. Between June 2022 and her trial in November 2022, the mother did not attend any scheduled visits or communicate with DCF. The mother's lack of visits caused emotional upset to the twins.

When the mother did attend visits, she was routinely late and often spent part of the visit on her cell phone. The mother failed to console her newborn son or to care for his specific medical needs, requiring one of the twins to attend to him during visits. At other visits, the mother upset the twins by insulting their clothing or hairstyles.

The mother was repeatedly hospitalized between July and December 2021 for complications from her drug use. The mother failed to provide DCF with any information about her hospitalizations and only once notified DCF that she was in fact hospitalized. The mother left the hospital numerous times against medical advice.

4

During their time in foster care, the twins became medically up to date and showed improvement in both academic attendance and performance. Although the twins initially lived together with their maternal step-grandmother, their behavioral issues required DCF to find different placements for each child. The twins went through several placements before all siblings were reunited in the same preadoptive foster home. In August 2022, Fiona was removed from the home because of behavioral issues, including fighting with her twin sister.

On November 29, 2022, trial began. The mother was not present. The mother's attorney indicated that the mother was aware of the trial date and had been expected to attend. Twenty minutes after the start of the trial, the judge called the mother to determine her whereabouts. The mother stated she had only just woken up and would be there in fifteen minutes. The mother never showed up to the trial and declined multiple subsequent calls from the judge. The mother never provided an explanation for her absence. The judge ultimately drew a negative inference from the mother's absence.

At the time of trial, Andrea and Braden were placed in the same foster home, and the adoption plan was for them both to be adopted by the foster family. Fiona was in a residential treatment program, where she was doing well. DCF's plan for Fiona was for her to be adopted by the same foster family. The

social worker, however, testified that DCF was "waiting on the return of the child assessments," which were needed to "determine what is in their best interest for a final living situation."[2]

The judge found the mother unfit and terminated her parental rights to each of the children. This appeal followed.

2. Standard of review. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Because termination of a parent's rights is an 'extreme step,' . . . a judge must decide both whether the parent is currently unfit and whether, 'on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary.'" Adoption of Ilona, 459 Mass. 53, 59 (2011), quoting Adoption of Carlos, 413 Mass. 339, 350 (1992). "In making this determination, a judge must consider 'a parent's character, temperament, conduct, and capacity to

_____

[2] As is discussed infra, after trial the child assessments revealed that adoption by the foster family was no longer viable.

6

provide for the child in the same context with the child's particular needs, affections, and age.'" Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Adoption of Mary, 414 Mass. 705, 711 (1993). General Laws c. 210, § 3 (c), provides a nonexhaustive list of factors to be weighed in determining the fitness of a parent.

Where there is clear and convincing evidence that the parent is unfit and likely to remain so, we give substantial deference to the trial judge's decision regarding the child's best interests and "reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. at 59. "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Adoption of Larry, 434 Mass. 456, 462 (2001), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993). An abuse of discretion exists where the decision "amounts to a 'clear error of judgment' that falls 'outside the range of reasonable alternatives.'" Adoption of Talik, 92 Mass. App. Ct. 367, 375 (2017), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

3. Termination of parental rights. a. Unfitness. The mother argues that the trial judge made several errors in her findings of fact. The evidence at trial, specifically the testimony of the mother's DCF social worker, supported the judge's finding that the mother did not sign DCF releases while hospitalized between July and December 2021, did not maintain ongoing communication with DCF during this time, and did not timely seek additional time for the completion of action plan items. See R.D. v. A.H., 454 Mass. 706, 719 (2009), quoting Care & Protection of Three Minors, 392 Mass. 704, 711 (1984) ("It is within the judge's discretion to evaluate the credibility of witnesses and to make [her] findings of fact accordingly"). That the mother may have sent a "vague" e-mail in 2022 that was inadequate to allow DCF to work with a private social worker to set up a home visit does not leave us "with the definite and firm conviction that a mistake has been committed." Adoption of Larry, 434 Mass. at 462, quoting Custody of Eleanor, 414 Mass. at 799 (1993). Similarly, that the mother's attorney asked for additional time for the mother to participate in services "minutes before a foster care review" does not seriously detract from the judge's finding that the mother "did not timely seek additional time for action plan tasks."

The mother and Fiona further argue that the judge erred in finding a nexus between the mother's problems with substance use

8

and any harm or danger to the children. "Evidence of alcohol or drug abuse is . . . relevant to a parent's willingness, competence, and availability to provide care." Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008). A parent's substance use disorder, however, is not sufficient to justify termination of the parent's parental rights "[w]ithout a showing that the mother's drug and alcohol use rendered her unable to provide minimally acceptable care for her child." Adoption of Zoltan, 71 Mass. App. Ct. 185, 191 (2008).

Here, the evidence showed that the mother's drug use negatively impacted each of the three children. The newborn tested positive for cocaine and opiates and suffered prolonged withdrawal effects requiring nearly a month-long hospitalization. Prior to birth, the mother was deceptive with DCF about her pregnancy status, declined offered services, and refused to participate in drug screenings. The mother failed to arrange for the care of the twins during her delivery, leaving them unattended and unaware of what was happening until DCF assumed custody of them.

"[T]he parent's willingness to engage in treatment is an important consideration in an unfitness determination where the substance dependence inhibits the parent's ability to provide minimally acceptable care of the child." Adoption of Luc, 484 Mass. 139, 147 (2020). Here, the evidence demonstrated that the

9

mother's unwillingness to admit and treat her substance use disorder and associated health diagnoses negatively affected her children. Starting in January 2021, the mother lied to DCF employees about her substance use disorder and never completed any required drug screening tests. When her substance abuse disorder resulted in numerous hospitalizations between July and December 2021, the mother refused to provide medical releases to DCF, failed to engage in consistent communication with DCF, and repeatedly left the hospital against medical advice only to return for assistance on a different day. Id., quoting Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass 279, 289 (1987) ("the mother's unwillingness to adhere to DCF's service plan, which required her to obtain treatment for her mental health challenges and substance use disorder, is 'relevant to the determination of unfitness'"). It was in this period that the mother's visits became spotty and unsatisfactory before ending altogether.

Moreover, the mother's inability to address her own medical diagnoses mirrors her failure to adequately address those of her children. Adoption of Lisette, 93 Mass. App. Ct. 284, 295 (2018) (affirming termination decree where mother "does not fully understand the scope of [the child's] medical issues" given failure to obtain necessary medical services). Prior to DCF involvement in 2021, the twins were overdue for physical

10

examinations by nearly three years and required the scheduling of specific medical appointments.

During visits with her children, the mother showed a lack of understanding about her son's asthma and treatment and indifference to his general care, deferring supervision and treatment to her daughters. In one instance, the mother informed the twins and the accompanying social worker that her son was "crying too much," and that he would need to change his behavior when he came home as "he's got to get used to her somehow." The mother's consistent failure to address her own or her children's medical needs provided substantial support for the judge's conclusion that her unfitness was likely to continue indefinitely.

Finally, the mother's argument that her past parenting success establishes the likelihood of her future fitness is unpersuasive. The mother ignores that the record demonstrates that her problems with substance use have dramatically worsened since her pregnancy with Braden, degenerating into multiple hospitalizations. The mother's unwillingness to meet her children's medical or academic needs prior to DCF custody has expanded into her unwillingness to communicate with DCF or to comply with the action plan following removal of the children. The mother's failure to seek or accept services prior to May 2021 persisted throughout the entirety of proceedings despite

11

her access to nondepartment programs and an independent social worker. Notably, the mother failed to attend her own children's best interests trial. Given the lack of evidence of any discernible progress by the mother after 2021, it was reasonable for the trial judge to find, by clear and convincing evidence, that the mother's present unfitness will continue indefinitely.

b. Best interests. It is not enough, however, merely to determine that the parent is unfit and that the parent's unfitness is likely to continue indefinitely. To terminate parental rights, the judge must also determine that "the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. at 59. As stated, this determination is within a judge's discretion. See Adoption of Nancy, 443 Mass. 512, 516 (2005). Here, the judge reasonably found that termination was in the best interests of each of the children because it freed them for adoption.

The trial evidence at the time the judge issued her findings was that both Andrea and Braden had been placed in the same home with a foster family that intended to adopt them. Fiona had been placed in that home, but by February 2022 had been removed because she was stealing and damaging the home and getting into physical fights with her twin sister. In May 2022, she would not discuss the possibility of adoption (or anything

12

about the future) with DCF.  In August, however, she was placed in a residential treatment program.  The evidence before the judge was that Fiona was "very much improved," "getting student of the day multiple times a week," "participating with her peers," and no longer getting into physical fights.  The judge was also told that "[t]he girls have been getting along" and "would like to be together in the future."  Moreover, counsel for Fiona twice told the trial judge at trial that Fiona wished to be freed for adoption.  Based on that trial evidence, the trial judge acted within her discretion in determining that being freed for adoption was in Fiona's best interests.  See Adoption of Jacques, 82 Mass. App. Ct. at 610.[3]

Complicating the situation is a February 2023 permanency report that was filed and considered by the judge in February and March 2023 after the trial concluded such that it was not part of the record at the time that the judge issued her findings.  That report revealed that, at some point before February 2023, an external agency child assessment stated that the twins should not be placed together.  By this point, the

---

[3] Similarly, based on this evidence, we discern no error in the judge's finding that it was likely that Fiona would be adopted by the preadoptive family.  The judge recognized the different situations faced by Fiona and Andrea and made a reasonable prediction based on the evidence before her.

preadoptive family was not willing to adopt Fiona.[4]  This information, however, was not a part of the trial record when the judge issued her findings and thus we cannot consider it.[5] "We address the propriety of the judge's orders based on the evidence introduced at trial, and not on posttrial events." Adoption of Willow, 433 Mass. 636, 644 n.8 (2001).  Accord Adoption of Inez, 428 Mass. 717, 722 (1999) (criticizing Appeals Court for considering posttrial affidavits).  Based on the evidence before the judge at the time she issued her findings, the judge acted within her discretion in terminating the mother's parental rights to free the children for adoption.

4.  Adoption plan.  An adoption plan need not be "'fully developed' in order to support a termination order, but it must provide 'sufficient information about the prospective adoptive placement "so that the judge may properly evaluate the suitability of the department's proposal."'"  Adoption of Varik, 95 Mass. App. Ct. 762, 770 (2019), quoting Adoption of Willow, 433 Mass. 636, 652 (2001).  To determine the sufficiency of the plan, the judge may consider evidence and testimony "regarding

_____

[4] Similarly, at some point prior to December 2023, Andrea was removed from the preadoptive home.  She continues to support termination to be freed for adoption.

[5] After the judge issued her findings, the parties entered this report into the trial record but made no request for the judge to reconsider the decrees or even to amend her findings.

14

unfitness and the child's best interests, in addition to the written plan." Adoption of Varik, supra. The judge's determination that a particular plan is in the child's best interests "presents 'a classic example of a discretionary decision' to which we accord substantial deference." Adoption of Jacob, 99 Mass. App. Ct. 258, 272 (2021), quoting Adoption of Peggy, 436 Mass. 690, 705, cert. denied sub nom. S.T. v. Massachusetts Dep't of Social Servs., 537 U.S. 1020 (2002).

Here, even considering only the trial evidence, the adoption plan was deficient concerning Fiona. DCF's plan was for Fiona to be placed with the preadoptive family, but the social worker testified that this plan was "waiting on the return of the child assessments," which were necessary "to help us determine what is in their best interest for a final living situation." Without the necessary information to determine a suitable placement, this plan was far from ready to be approved. To be sure, where matters are unsettled, it might be necessary "to allow for flexibility in the plan." Adoption of Xarissa, 99 Mass. App. Ct. 610, 622 (2021). Rather than create a "written plan [that] discussed in detail the child's mental health and behavioral needs," id., however, the plan here blindly relied on adoption by the preadoptive family despite recognizing that this option might well neither be available nor in the child's best interests. As "we may remand the matter for further proceedings

15

with regard to the department's proposed adoption plan without vacating that portion of the decree that terminates the [parent's] rights," Adoption of Varik, 95 Mass. App. Ct. at 774, we vacate that portion of the decree that approves the adoption plan and remand for further proceedings on this issue.

5. Visitation. The judge ordered parental visitation with Fiona at least twice in 2023, once per year starting in 2024, and after adoption only if the mother is sober and the adoptive parent "agrees that it is not harmful to the child." Fiona (but not the mother) challenges this order.[6] At trial, however, Fiona requested that there be no order of visitation and the issue, therefore, is waived. See Adoption of Ursa, 103 Mass. App. Ct. 558, 570 (2023).

In any event, "[a] trial judge's decision whether to order visitation between a child and a parent whose parental rights have been terminated is reviewed for an abuse of discretion." Adoption of Xarissa, 99 Mass. App. Ct. at 623-624. The mere existence of parent-child bond is insufficient to require frequent visitation, as "[t]he purpose of such contact is not to strengthen the bonds between the child and [her] biological

---

[6] Fiona also challenges the absence of an order of sibling visitation. After Fiona filed her brief, the trial judge laudably acknowledged that she had erred in not ordering sibling visitation and entered an order for such visitation. Accordingly, this issue is moot.

mother or father, but to assist the child as [she] negotiates . . . the tortuous path from one family to another." Adoption of Douglas, 473 Mass. 1024, 1028 (2016), quoting Adoption of Vito, 431 Mass. 550, 564-565 (2000). Here, "[a]s the matter progressed, the mother became less and less consistent with visits." Adoption of Xarissa, supra at 624. The mother "stopped visiting with the children by June 2022 and had missed 5 months of opportunities for family time as of the time of trial," missed the termination trial, and abandoned the legal proceedings. Under these circumstances, "the judge acted within her discretion in finding a bond between the mother and child, but concluding that requiring one court-ordered visit per year was in the child's best interests." Id. at 625.

6. Conclusion. With regard to Fiona, we vacate that portion of the decree approving DCF's adoption plan and remand this matter for further proceedings in accordance with this

decision.  In all other respects, the decrees as to the children are affirmed.

So ordered.

By the Court (Blake,
  Ditkoff & D'Angelo, JJ.[7]),

*Paul Little*

Clerk

Entered:  October 31, 2024.

---

[7] The panelists are listed in order of seniority.