GUARDIANSHIP OF ESTELLE.[1]

No. 06-P-1612.

Worcester. May 17, 2007. - October 29, 2007.

Present: COWIN, BROWN, & MEADE, JJ.

*Parent and Child,* Custody of minor. *Minor,* Custody.

A probate judge erred in granting guardianship of a child to her maternal
uncle and aunt (with the father as coguardian), where the judge did not
find that the father was an unfit parent; however, given that the judge's
subsidiary findings were generally negative with respect to the father's
parenting, and were not offset by any findings that were positive in nature,
this court remanded the matter to permit the judge to reconsider his subsidiary
findings, make additional subsidiary findings if necessary, and decide
whether the father is a fit parent [577-583], as well as to consider (should
he determine that the father is fit and therefore entitled to custody) whether
the uncle and aunt qualified as de facto parents and whether the child's
welfare would be enhanced by continued access to them [583-584].

PETITION for guardianship filed in the Worcester Division of
the Probate and Family Court Department on May 4, 1998.

The case was heard by *Ronald W. King,* J.

*Roxann C. Tetreau* for the father.

*Mark I. Zarrow* for the petitioners.

COWIN, J. The biological father of the minor child, Estelle, ap-
peals from a judgment of the Probate and Family Court grant-
ing a guardianship of the child to the child's maternal uncle and
aunt, with the father appointed as coguardian. The father asserts
that, given the judge's finding that he is not an unfit parent, he
is entitled to outright custody of the child without the limita-
tions inherent in the vesting of guardianship authority in others.
In support of the judgment, the uncle and aunt argue that they
had parented the child for seven years by the time of trial; she

---

[1] A pseudonym.

is happy, well adjusted and developing normally; she visits regularly with her father; and a precipitous transfer of custody would be harmful to her.

We credit the judge with a sensitive attempt to sort out the complexities of the case and arrive at a compromise that was in the child's best interests. His solution, however, cannot stand as a matter of law because the father is correct that, absent a finding of unfitness on his part, the judge is without authority to require that he share parenting decisions with others. We remand for further findings in accordance with the discussion below.

1. *Background.* The facts and prior proceedings are not disputed. The child was born to the mother and father in December, 1997. By that time, the relationship between the mother and father had ended. The mother died in April, 1998. The mother's brother and his wife immediately assumed care of the child and, on May 6, 1998, were appointed the child's temporary guardians. Since that time, the uncle and aunt have provided the child's primary physical care, and the child has developed a close relationship with the uncle and aunt and their two biological children. The uncle and aunt have performed all of the normal parental functions, including providing health insurance for the child; seeing to her religious education; participating in her academic and extracurricular activities; and taking her on family vacations. The child refers to the uncle and aunt as "Dad" and "Mom," although she knows that they are not her biological parents. She has thrived in the course of their parenting.

The father had, at the time of trial, played a far less significant role in the child's life. The child did visit with the father on a regular basis and refers to him as "Daddy Sam."[2] Despite a recommendation by a guardian ad litem that he attend parenting classes, the father did not do so. On March 9, 1999, a probate judge ordered that the father pay $50 weekly to the uncle and aunt in child support. The father's first five support checks were returned for insufficient funds, and it was not until he was found in contempt that he began to comply with the support orders. The judge found that the father "has not made the effort

---

[2]A pseudonym.

necessary to be the Child's primary parent" and that he has "failed to take an active enough role in the Child's life."

While the father was apparently perfectly willing to have the child raised in large part by the uncle and aunt, he was not content that they be vested with legal authority in the matter, and on July 24, 1998, he filed a motion to terminate the guardianship. On March 9, 1999, a guardian ad litem was appointed. This ushered in an inexplicable period of an additional six and one-half years during which the case was "investigated."[3] The case was finally tried on September 19 and 20, 2005. The judge found "that totally separating the Child from [the uncle's and aunt's] home would be damaging," and that a "continued role of all the adults in her life would be in the child's best interest until she was older and better able to cope with more significant change." At the same time, he concluded that there was "insufficient evidence to establish that the [father] was completely unfit as a parent in order to prevent him from having continuing contact with the Child."

In accordance with these findings and rulings, the judge created a coguardianship and relieved the father of the obligation to make child support payments. He provided in the judgment for a specific schedule with respect to the sharing of the child by the coguardians and ordered the father to perform all of the recommendations of the guardian ad litem. He concluded the judgment by stating: "In balancing the best interest[s] of this child and the fitness of the Father, the Court finds that complete termination of this guardianship would have severe and drastic effects on this child who all agree is presently very well adjusted and happy sharing both homes."

2. *Fitness of the father.* The judge attempted to maintain the conditions in which the child had thrived from the time of her infancy, while still permitting the child's surviving biological parent both to have a present role in her life and to expand the

---

[3]We do not know what contributed to the delay. While it is apparent that the child was not harmed in this case, it is ordinarily unacceptable that a custody dispute remain unresolved for such an extended period. See *Custody of a Minor*, 389 Mass. 755, 764 n.2 (1983); *Care & Protection of Three Minors*, 392 Mass. 704, 705 n.3 (1984); *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. 689, 690 n.1 (1985).

scope of that role if appropriate. While that may well have been a desirable objective, his findings did not permit its adoption.

Custody of a child belongs to a parent unless that parent is unfit. See *Bezio* v. *Patenaude*, 381 Mass. 563, 576 (1980); *Care & Protection of Zelda*, 26 Mass. App. Ct. 869, 871 (1989); *Guardianship of Yushiko*, 50 Mass. App. Ct. 157, 159-160 (2000); *Care & Protection of Lillith*, 61 Mass. App. Ct. 132, 143 (2004). Here, the relationship of the judge's subsidiary findings regarding the father's fitness and his ultimate finding on that subject are ambiguous. The subsidiary findings are generally negative with respect to the father's parenting. Thus, following the child's birth, the child and her mother lived with the child's maternal grandmother until the death of the mother, after which the child was cared for by her maternal uncle and his wife. A contempt finding was required before the father paid child support. Neither the father nor members of the father's family had called the child at her residence. The father had not involved himself in the child's school life or extracurricular activities. He had never taken the child on a vacation. He had failed to attend recommended parenting classes. Despite the uncle's and aunt's practice of never denying him visits with the child, the father had, in the judge's words, "failed to take an active enough role in the Child's life."

The negative subsidiary findings are not offset by any findings that are positive in character. They leave an over-all impression that the father, while not abusive or neglectful when the child was with him, was indifferent regarding his role as a parent and, as noted *supra*, had been perfectly willing to have the uncle and aunt shoulder the greater share of the child's upbringing. That there was some uncertainty in the judge's mind is reflected in his apparently carefully worded ultimate conclusion that there was "insufficient evidence to establish that the [father] was completely unfit as a parent in order to prevent him from having contact with the Child."

As suggested above, the judge attempted to steer to a middle ground between fitness and lack of fitness on the part of the father, to the end that he could maintain some degree of control of the situation without jeopardizing the father's ability to develop a relationship with the child. The problem with that approach is

that our law only recognizes two possibilities: in given circumstances, a parent is either fit or unfit. While the judgment may be on occasion difficult to make, it must be made. We assume without more that a parent is fit to raise his or her child, and if, as the judge decided here, the evidence is insufficient to establish the contrary, a parent's right to the custody of his child must be acknowledged. See *Custody of a Minor*, 389 Mass. 755, 765 (1983); *Guardianship of Yushiko*, 50 Mass. App. Ct. at 159-160.

We believe that, in the circumstances, a remand is appropriate so that the judge, with or without additional evidence as he deems desirable,[4] may reconsider his subsidiary findings; make additional subsidiary findings if necessary; and come to a conclusion whether the father is fit or unfit. We remand because of the apparent ambivalence of the judge on the subject, and for the reason we express *infra*. We do not seek to dictate an outcome. The judge who hears the evidence, observes the parties, and is most familiar with the circumstances remains in the best position to make the judgment. See *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption*, 385 Mass. 482, 488-489 (1982).

The decision should be informed by a recognition that the fitness of a parent cannot be considered in the abstract. Fitness is not merely the absence of abuse or neglect; nor is it a set of abilities or characteristics that are the same in all circumstances. On the one hand, we defend the right of a parent to the custody of his or her child, yet we recognize that the right will not be enforced if it results in harm to the child, in other words, if the parent is "unfit." See *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 642 (1975). The "critical inquiry" in such cases is finding parental unfitness by clear and convincing evidence. *Adoption of Nancy*, 443 Mass. 512, 515 (2005). See *Custody of a Minor*, 389 Mass. at 766; *Care & Protection of Erin*, 443

---

[4]In deciding whether to take additional evidence, the judge may consider the period of time that has elapsed since the trial and whether there have been events or other considerations during that period that could affect the outcome. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 593-594 (1981).

Mass. 567, 570 (2005). At the same time, the "best interests of the child" is the touchstone of the analysis. See, e.g., *Adoption of Nancy*, *supra*. An earlier decision went so far as to state that, "[i]n determining whether [a parent is] unfit, the most important consideration is whether the welfare of the child would be served by custody in [the parent] or in a guardian." *Wilkins* v. *Wilkins*, 324 Mass. 261, 262 (1949). But subsequent cases have established that this is not literally correct, for we do not transfer a child from his or her parent to other custodians merely because the latter may provide a more advantageous environment for the child's upbringing. See *Custody of a Minor*, *supra* at 765 ("Custody is not to be transferred from the [biological] parent simply because another prospective custodian is thought to be better qualified. A comparison of the advantage the prospective custodian may offer to the child with those that may be offered by the [biological] parent[] is inappropriate").

The question, then, is how to balance a parent's capacity to care adequately for a child (i.e., his or her "fitness") with that child's "best interests," given the child's current circumstances. It has been stated that "the tests 'best interests of the child' in the adoption statute and 'unfitness of the parent' in the guardianship statute reflect different degrees of emphasis on the same factors, that the tests are not separate and distinct but cognate and connected." *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. at 641. "Neither the 'parental fitness' test nor the 'best interests of the child' test is properly applied to the exclusion of the other." *Bezio* v. *Patenaude*, 381 Mass. at 576-577. "The term ['unfitness'] is a standard by which we measure the circumstances within the family as they affect the child's welfare." *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 589 (1981).[5]

Because we do not deal with a subject that is susceptible to

---

[5]The concern expressed by then Justice Hennessey in his dissent in *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. at 647, that the Legislature may have intended "unfitness" to be the standard in certain circumstances, while "best interests of the child" would be the standard in others, has been resolved. The dissent recognized that the definition of unfitness was, at that time, "in flux." *Id.* at 647 n.1. It is now clear that "the unfitness standard must be applied whenever the State

"mathematical precision," criteria of necessity must be stated in general terms, and the principles may be difficult to apply in individual cases. *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. at 646. At a minimum, the fitness of a particular parent cannot be judged without a consideration of that parent's willingness and ability to care for the child, as well as the effect on a child of being placed in the custody of that parent. One who is fit to parent in some circumstances may not be fit if the circumstances are otherwise. A parent may be fit to raise one child but not another. See *Richards* v. *Forrest*, 278 Mass. 547, 553 (1932).

Here, a key factual question for resolution is whether the father is fit to parent this particular child in light of the lengthy period during which she has been raised by, and has bonded with, the uncle and aunt, and in which the father has had a significantly lesser role in the child's life. The judge did not address this question directly, preferring the solution of a coguardianship. As we have stated, that solution is not available if the father is found to be fit.

"Although the bonding of a child with foster or adoptive parents is not a dispositive consideration, it is a factor that has weight in the ultimate balance." *Adoption of Nicole*, 40 Mass. App. Ct. 259, 262-263 (1996). While such bonding cannot be decisive per se, the Legislature has directed, at least where there is the potential of dispensation of the requirement of parental consent to a child's adoption, that a judge consider whether the child has formed "a strong, positive bond" with a caretaker, and whether "the forced removal of the child from the caretaker would likely cause serious psychological harm to the child and the parent lacks the capacity to meet the special needs of the child upon removal." G. L. c. 210, § 3(*c*)(vii). See *Adoption of Katharine*, 42 Mass. App. Ct. 25, 30-31 (1997); *Adoption of Daniel*, 58 Mass. App. Ct. 195, 202-203 (2003).

Thus, there must be attention to the effect on this child of

seeks to terminate [a parent's] rights to the custody of [his or her] minor child[], whether the State proceeds under the care and protection statute (G. L. c. 119, §§ 23-29), the guardianship statute (G. L. c. 201, § 5), or the adoption statute (G. L. c. 210, § 3)." *Custody of a Minor*, 389 Mass. at 765, quoting from *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. at 589.

whatever separation from the uncle and aunt would come about if there is a transfer to the father, including whether the father is prepared and able to cope adequately with the child's trauma that would inevitably accompany her separation from the uncle and aunt. See *Adoption of Katharine*, 42 Mass. App. Ct. at 30-31. These considerations may have a direct effect on whether the father is fit to parent *this* child in *these* circumstances at *this* time. Though the importance and parameters of an attachment to a foster parent or guardian have varied, the validity of considering the effect of a transfer of custody on the child as an element of the fitness of the transferee has been upheld consistently. *Id.* at 29-31. See *Wilkins* v. *Wilkins*, 324 Mass. at 263-264; *Guardianship of Clyde*, 44 Mass. App. Ct. 767, 772-775 (1998). "A parent cannot be deprived [of custody] unless some affirmative reason is shown for doing so such as a finding . . . of a separation so long as to permit very strong bonds to develop between the child and the prospective adoptive parents." *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. at 642. "[I]f returning custody to the [biological] parent[] would be seriously detrimental to the welfare of the child, then the parent[] could be considered to be unfit." *Bezio* v. *Patenaude*, 381 Mass. at 575.

The judge plainly recognized the issue, and touched on it in his findings. Thus, the judge noted that the child "has experienced some reservation about visiting the [father and] becomes sad when visits with the [father] near." She also "acts out after returning from visits with the [father]." The judge concluded that "sufficient evidence showed that totally separating the child from [the uncle and aunt's] home would be damaging to the Child." On remand, after whatever augmentation of the record is appropriate, the judge must decide, along with ordinary questions of fitness, specifically whether the effect on the child of a transfer of custody to the father would be sufficiently negative that the father would be unable to address the child's special needs and must therefore be deemed unfit in the circumstances. See *Duclos* v. *Edwards*, 344 Mass. 544, 546 (1962) (order removing guardian and returning child to father perhaps distressing, but important that child be reared with her own next of kin and in companionship with her own sisters). Should such further

consideration result in a finding that the father is unfit in the circumstances, it follows that there would not be a transfer of custody and that a guardianship (presumably with the uncle and aunt) might lawfully be maintained.[6] Should it be determined that the father is fit, he would be entitled to custody, though the uncle and aunt might have continuing rights as "de facto parents."

3. *The uncle and aunt as de facto parents.* It does not appear that the judge gave much, if any, attention to the possible status of the uncle and aunt as "de facto parents." See *Youmans* v. *Ramos*, 429 Mass. 774, 782-784 (1999). The judge and the parties focused only on whether the existing guardianship was to be continued. The uncle and aunt refer to the issue in this court. It is naturally of no moment in the event that the judge finds the father unfit and rules that the uncle and aunt should continue as the child's guardians. Should the judge find otherwise, i.e., that the father is fit, he may consider whether the uncle and aunt have performed as de facto parents.

"A de facto parent is one who has no biological relation to the child, but has participated in the child's life as a member of the child's family. The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions at least as great as the legal parent." *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 829, cert. denied, 528 U.S. 1005 (1999). "Caretaking functions" are considered to be that part of the parenting process "that involve[s] interaction with the child or that direct[s], arrange[s], and supervise[s] the interaction and care provided by others," and that "involve[s] the direct delivery of day-to-day care and supervision of the child." *A.H.* v. *M.P.*, 447 Mass. 828, 839 (2006), quoting from American Law Institute, Principles of the Law of Family Dissolution § 2.03(5) & comment g (2002). The caretaker has no rights independent of those of the child; it is the interests of the child, not those of the caretaker, that determine whether a de facto parent relationship should be recognized. "[P]otential harm to the child is, of course, the criterion that

---

[6]The judge, of course, would have discretion to provide for reasonable visitation by the father (which the uncle and aunt have never refused in any event).

tips the balance in favor of continuing contact with a de facto parent against the wishes of the fit legal parent." *A.H.* v. *M.P.*, 447 Mass. at 840.

Here, the judge could find that the uncle and aunt provided the lion's share of caretaking services, and did so with the consent of the father. That the father objects to a continued guardianship and seeks custody on the ground that he is a fit parent does not alter the fact that he agreed that the child should be raised by the uncle and aunt. If the judge determines that the father is fit and therefore entitled to custody, he should consider whether the uncle and aunt qualify as de facto parents and whether the child's welfare would be enhanced by continued access to them.

4. *Disposition.* The judgment is vacated. The case is remanded to the Probate and Family Court for further proceedings in accordance with this opinion.

*So ordered.*