C.P. *vs.* R.S., administrator.[1]

No. 10-P-1010.

Worcester. February 1, 2011. - January 31, 2012.

Present: GRASSO, McHUGH, & WOLOHOJIAN, JJ.

*Paternity. Minor,* Custody, Visitation rights. *Parent and Child,* Custody.

A Probate and Family Court judge properly awarded legal and physical custody of a child to the husband of the child's deceased mother (custodian), rather than the plaintiff, whom the judge found to be the child's father, where the judge's finding that it would not be in the child's best interests to transfer custody to the father was firmly rooted in the evidence, in light of the child's relationship with the custodian and the child's brother and grandparents, as well as the father's limited contact with the child. [225-228]

CIVIL ACTION commenced in the Worcester Division of the Probate and Family Court Department on April 2, 2008.

The case was heard by *Lucille A. DiLeo,* J.

*Francis J. Russell* for the plaintiff.

McHUGH, J. This is a custody dispute between C.P., the biological father (father) of a young boy, whom we shall call Samuel, and R.S., the husband (husband) of the child's deceased mother (A.S.). The father appeals from a Probate Court decision finding that he was unfit, awarding custody of Samuel to the husband, and allowing the father to have visitation. On appeal, the father contends that the probate judge's decision lacked a factual basis on which to find that the father is unfit to parent Samuel, and was error as a matter of law. We affirm, for, in the last analysis, this is an instance in which "consideration of what is in a child's best interests . . . weigh[s] more heavily than the genetic link between parent and child." *Paternity of Cheryl,* 434 Mass. 23, 31 (2001).

*Background.* The catalyst for this dispute was the untimely

[1]Of the estate of A.S.

death of A.S., Samuel's mother, on December 20, 2006. A.S. and the husband had their first child, whom we shall call Frederick, in 1999. The father and A.S. first met the next year. By 2001, their relationship had become intimate and ultimately produced Samuel, who was born on September 12, 2003.

A.S.'s relationship with the father led to her eight-month separation from the husband, though they had reconciled by the time Samuel was born. When she discovered that she was pregnant, A.S. told the father and also told him that the child was his. Initially, he was supportive and joined her when she visited the obstetrician during the course of her pregnancy. By September 12, 2003, however, conflicts had broken out and the father did not attend Samuel's birth. Instead, the husband attended.

The birth certificate lists the husband as the child's father and they share the same last name. Samuel lived solely with A.S., the husband, and Frederick until A.S.'s death in 2006. Thereafter, Samuel continued to live solely with the husband and Frederick.

While A.S. was alive, she brought Samuel to the father's home for visits for several hours each Friday and on some weekends. As Samuel approached his second birthday, A.S. left him with the father for overnight visits. Until A.S.'s death, the father provided A.S. with some financial support for Samuel's needs, though the amount is unclear from the record.

Throughout Samuel's life, the husband has treated him as his son. Although the husband knew that A.S. brought Samuel to the father's home for visits, he never officially questioned Samuel's paternity. At trial, he testified that Samuel was his son and that he had treated him as his son for his entire life. In turn, Samuel identifies the husband as "daddy." Since A.S.'s death in 2006, the husband has assumed all parenting of both Samuel and Frederick and receives some support from both A.S.'s mother (maternal grandmother) and the husband's mother (paternal grandmother). Samuel and Frederick enjoy a strong brotherly bond. The judge found that "[t]hey play sports together, walk to school together,[2] and do their homework together."

Before A.S.'s death, the father never formally challenged

---

[2]The testimony reflects that they walk home from school every day together, but they are driven to school in the mornings.

Samuel's paternity.[3] On September 11, 2007, nine months after A.S.'s death, however, the father filed a "Complaint in Equity" requesting that the Worcester Division of the Probate and Family Court Department declare that he is Samuel's father. That complaint was dismissed on January 7, 2008, and no appeal was taken. On April 2, 2008, the father filed the underlying "Complaint to Establish Paternity." The first trial ended on June 11, 2009, when the judge entered what she called a "directed finding" in favor of the husband after the father failed to introduce any deoxyribonucleic acid evidence. Three months later, on September 1, 2009, the same judge allowed the father's motion to vacate the judgment and reopen the case.

On September 24, 2009, a second trial began. At the conclusion of the trial, the judge found, on the basis of a genetic marker test that had been introduced in evidence, that the father was in fact Samuel's father, a conclusion the husband did not challenge. She also found that, under the specific circumstances the evidence revealed, the father is unfit to parent Samuel and that Samuel's best interests would be served by awarding legal and physical custody of him to the husband. Recognizing that A.S. "felt it was important to foster a relationship between [Samuel] and his biological father," the trial judge also ordered visitation between the father and Samuel. Initially, the visits are to occur one day each week after school and every Saturday, and they will eventually transition to a schedule that includes overnight visits during the week and alternating full weekends. In entering that order, the judge reasoned that the visitation schedule "will not only allow the [father] to reestablish the prior relationship between [the father] and [Samuel], but will do so without disrupting the stable home environment to which the child has grown accustomed."

*Analysis.* The judge's finding of paternity is supported by clear and convincing evidence, see *C.C.* v. *A.B.*, 406 Mass. 679, 686-689 (1990), and it is well established that "[c]ustody of a child belongs to a parent unless that parent is unfit." *Guardian-*

---

[3]The father testified that directly after Samuel was born he went to the Worcester Division of the Probate and Family Court Department and "asked the clerk for a notification to where I have rights to this child." He testified that he received some forms, but never completed them or returned to the court again.

*ship of Estelle*, 70 Mass. App. Ct. 575, 578 (2007), citing *Bezio v. Patenaude*, 381 Mass. 563, 576 (1980); *Guardianship of Yushiko*, 50 Mass. App. Ct. 157, 159-160 (2000); *Care & Protection of Lillith*, 61 Mass. App. Ct. 132, 143 (2004). In custody matters, however, "[t]he term ['unfitness'] is a standard by which we measure the circumstances within the family as they affect the child's welfare." *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 589 (1981). "At a minimum, [therefore,] the fitness of a particular parent cannot be judged without a consideration of that parent's willingness and ability to care for the child, as well as the effect on a child of being placed in the custody of that parent. One who is fit to parent in some circumstances may not be fit if the circumstances are otherwise. A parent may be fit to raise one child but not another." *Guardianship of Estelle, supra* at 581.

The probate judge was clearly aware of these standards when she made her careful and thorough factual findings and legal conclusions. The judge's ultimate finding, based on numerous subsidiary findings, was consistent with the principle articulated by the court in *Guardianship of Estelle, supra* at 582 (trial judge must determine whether "the father is fit to parent *this* child in *these* circumstances at *this* time").[4] It is apparent that in making that determination, the judge considered "along with ordinary questions of fitness . . . whether the effect on the child of a transfer of custody to the father would be sufficiently negative that the father would be unable to address the child's special needs and must therefore be deemed unfit in the circumstances." *Ibid.*

The father interacted with Samuel in various ways and at various points after his birth. Prior to her death, A.S. brought Samuel to the father's home for visits and even permitted him to stay overnight occasionally. That contact, though, hardly compares to the active parenting role the husband has maintained from the very moment Samuel was born, a role that has increased and deepened since A.S.'s death.

The judge found that "[s]ince [A.S.]'s death, both the [father's] financial support for and [his] visits with [Samuel] ceased," and

---

[4]In so doing, the judge made precisely the finding that was missing from *Estelle* and required a remand for further consideration. *Ibid.*

"there is no dispute that the [father] has had virtually no contact with [Samuel] during the last three (3) years of his life."[5] The husband has been solely responsible for Samuel and has assumed all parental functions. Samuel has never known anyone else to be a father figure and calls the husband "daddy." "[T]he lengthy period during which [Samuel] has been raised by . . . [the husband], and in which the father has had a significantly lesser role in [Samuel's] life" is a relevant factor when considering fitness. *Guardianship of Estelle*, 70 Mass. App. Ct. at 581. See *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 642 (1975) ("A parent cannot be deprived [of custody] unless some affirmative reason is shown for doing so such as a finding . . . of a separation so long as to permit very strong bonds to develop between the child and the prospective adoptive parents").

Being an occasional caregiver is far different from providing the daily necessities of life to Samuel, encouraging his loving relationships with family members, and providing and supporting schooling, sports, and other activities that are the hallmarks of a healthy upbringing. The husband, not the father, is the one who has done all of that.

Among the familial relationships the husband has fostered are Samuel's bonds with his brother Frederick and with both of his grandmothers. The bond between Frederick and Samuel is undisputed and his interaction with his brother encompasses much of his day. The record reflects that with Frederick, Samuel sees their paternal grandmother daily and their maternal grandmother weekly. There is no indication from the record that these relationships would continue were custody awarded to the father.[6] Like the amount of time the husband has spent caring for Samuel, Samuel's familial relationships with his sibling and

---

[5] The record contains ample support for those findings. At trial, the father testified that he had seen Samuel just once after A.S.'s death, at her funeral. The husband testified that he never prevented the father from seeing Samuel, but heard from him only infrequently — two or three times — after A.S. died. The husband also testified that he and Samuel met the father once at a fast food restaurant. There was also testimony that Samuel's maternal grandmother helped orchestrate several visits between the father and Samuel.

[6] In fact, there is evidence that they would not continue. While the father and the maternal grandmother have, in the past, had an amicable relationship, the father broke ties with her after A.S. died.

grandmothers are appropriate and important factors to weigh in determining his best interests. See *Abbott* v. *Virusso*, 68 Mass. App. Ct. 326, 339 (2007), *S.C.*, 450 Mass. 1031 (2008). See also *Rosenthal* v. *Maney*, 51 Mass. App. Ct. 257, 270 (2001).

Finally, the judge properly considered the harm that would befall Samuel if the longstanding familial relationship he has had with the husband were severed. The judge found that severing the relationship would "have a severely detrimental impact on [Samuel]." That impact is appropriate to consider when considering the father's fitness. "[W]e defend the right of a parent to the custody of his or her child, yet we recognize that the right will not be enforced if it results in harm to the child, in other words, if the parent is 'unfit.' " *Guardianship of Estelle*, 70 Mass. App. Ct. at 579. It is a particularly appropriate consideration because of the long time the father has elected to wait before asserting his claimed parental rights. That election allowed creation and strengthening of the relationships he now has decided it is time to sever. We caution that "we do not transfer a child from his or her parent to other custodians merely because the latter may provide a more advantageous environment for the child's upbringing." *Id.* at 580, citing *Custody of a Minor*, 389 Mass. 755, 765 (1983). Nevertheless, "the validity of considering the effect of a transfer of custody on the child as an element of the fitness of the transferee has been upheld consistently." *Guardianship of Estelle*, 70 Mass. App. Ct. at 582, citing *Adoption of Katharine*, 42 Mass. App. Ct. 25, 29-31 (1997). See *Wilkins* v. *Wilkins*, 324 Mass. 261, 263-264 (1949); *Guardianship of Clyde*, 44 Mass. App. Ct. 767, 772-775 (1998).

In this case, the trial judge found that in light of Samuel's relationship with the husband and his brother and grandparents, as well as his father's limited contact, it would not be in Samuel's best interests to transfer custody to the father. That finding is firmly rooted in the evidence and we agree with it.[7]

*Judgment affirmed.*

---

[7]Given the result we reach, we have no occasion to consider whether and to what extent the husband's rights as a de facto parent, see *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 829-830, cert. denied, 528 U.S. 1005 (1999), or the need for finality in such a relationship when viewed from the child's perspective, take precedence in a case like this over the rights the father seeks to assert.