NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-318

ADOPTION OF SALLY.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree issued by a Juvenile Court judge finding her unfit and terminating her parental rights to her daughter, Sally.  See G. L. c. 119, § 26; G. L. c. 210, § 3. The mother primarily argues that the judge erred in finding her indefinitely unfit because the Department of Children and Families (DCF) did not make reasonable efforts to reunify the mother and the child.  We affirm.

Background.  1.  The parties.  The mother was born in 1989. As a child, she experienced a drowning incident that left her with a central auditory processing disorder.  A court-ordered neuropsychological evaluation performed in February 2022 indicated that the mother had "considerable neuropsychological

_____

[1] A pseudonym.

impairments across myriad domains of neurocognitive functioning" and "diagnoses of Probable Major Neurocognitive Disorder Due to Traumatic Brain Injury (anoxia from drowning); Major Depressive Disorder; and features of Dependent Personality Disorder." The mother graduated from a vocational high school and attended two semesters at community college.

The mother has three children. Her first two children were born in 2014 and 2017. Their father is the mother's previous partner. DCF has had extensive involvement in the two children's lives, and their paternal grandparents have had guardianship of them since February 2020. In March 2020, the mother learned that she was pregnant with the child, at twenty-one weeks of pregnancy, and thus she was late in receiving prenatal care. The child's father is named on her birth certificate but he claims he is not her biological father.[2]

The child was born in July 2020, with several medical conditions including choanal atresia;[3] other congenital

---

[2] The father "has been involved minimally, if at all, with both the child and [DCF] since her birth," and did not appeal from the decree finding him unfit and terminating his parental rights.

[3] The judge found that "[c]hoanal atresia is a developmental abnormality characterized by 'a congenital narrowing of the back of the nasal cavity that causes difficulty breathing.' Bilateral choanal atresia specifically indicates that both nasal passages are blocked. This condition is rare, often associated with other developmental anomalies, and is life-threatening.

deformities of the skull, face, and jaw; other malformations of the ear; and candidates stomatitis.  Less than one hour after birth, she experienced respiratory distress requiring intubation and was transferred to a neonatal intensive care unit.  She remained there for the first month of her life because of the high risks associated with her medical conditions.  In August 2020, the child underwent the first of many surgeries to address her breathing difficulties.

2. Involvement with DCF.  In August 2020, in preparation for the child's impending release, the hospital staff notified the parents that they would have to complete a twelve-hour course on how to care for the child.  Over the next week, the parents came in every day and said they would complete the training the following day, but they failed to do so each time.  As a result, a mandated reporter filed a G. L. c. 119, § 51A report, alleging neglect.  A DCF investigator spoke to the parents about the allegations.  Despite numerous reminders and opportunities to do so, the parents never completed the full, twelve-hour day of training.

The child continued to have serious medical setbacks, and,

_____

Symptoms of choanal atresia appear immediately after birth, and infants with the condition often require intubation immediately after delivery [followed by prompt surgery] to open the nasal airway sufficiently to allow the infant to breathe on their own."

3

in the view of the hospital staff, the parents failed to demonstrate the competence necessary to care for her. Specifically, the staff were concerned that the parents "were not able to follow simple instructions, [and] they would not be able to provide the difficult medical care that the child needed and would require in the future."

Accordingly, in September 2020, DCF filed a care and protection petition and was granted temporary custody of the child. In the same month, the child was discharged from the hospital and placed in an unrestricted foster home. In October 2020, the child was placed in her current, long-term foster home, which became her preadoptive home in 2022. She has never been in the mother's physical custody.

Following the child's removal, DCF developed and implemented an action plan for the mother, including, but not limited to, requirements to engage in parenting classes, work with a parent aide, complete a neuropsychological evaluation, engage in therapy, and attend visitation with the child. The mother testified that the purpose of the plan was "to waste [her] time."

3. The mother's engagement with services. a. Visitation. Between September 2020 and December 2022, the mother attended visits inconsistently, frequently arriving late or not following visitation policies. The mother missed eight in-person visits

4

and also missed most of one virtual visit because her phone "died" and she failed to rejoin the visit. The mother arrived late to seven visits. When the mother did attend visits, they "typically went well and Mother presented as caring, engaging and overall appropriate with [the child]."

The mother has not visited the child since December 2022. In February 2023, after canceling several visits in December, the mother informed the DCF social workers that she stopped attending visits because of the price of gasoline. She then demanded more frequent visits closer to her residence. The DCF social worker recommended that the mother take the bus to visits and offered to request an Uber gift card to assist her. The mother refused to consider the bus because of a "bad experience" and refused to attend visits at a DCF office. Despite the mother's refusal to attend visits, the DCF worker continued to attempt to schedule monthly visits and to offer transportation assistance to the mother.

b. <u>Parenting skills</u>. At the direction of DCF, the mother attended and completed a twelve-week parenting class. The mother testified that she had learned nothing from the parenting class about the child's medical needs.

The mother did not effectively comply with her action plan task that she work with a parent aide or complete a parenting evaluation. Although the mother initially engaged with an aide

5

during home visits, the parent aide terminated the service in 2021 because of the mother's canceling and missing weekly meetings.  At the meeting terminating services, the mother stated that she did not understand why she was involved with DCF and why "everyone [was] targeting her."  DCF assisted the mother to reengage with her parenting aide, but ultimately, the aide and the mother mutually agreed to terminate the relationship because the mother was not benefiting from the services or working on any goals.  Furthermore, although the parent evaluator observed three parent-child visits, and the mother claimed she completed the evaluation, the mother refused to sign a release to allow DCF to obtain the results, claiming it was "never written up because the parent evaluator felt it would be used against [the mother]."

c.  Mental health and neurological concerns.  The mother complied with the action plan task that she engage in individual therapy, but DCF struggled to confirm the mother's engagement. The mother also complied with her task to receive a neuropsychological evaluation.  The mother testified that the sole recommendation of the evaluation was to work with a parent aide, but she later admitted that she had not read the evaluation.  The mother was therefore unaware of the recommendations therein, namely, to obtain a full psychiatric consult, medical evaluation, cognitive behavioral therapy, and

bloodwork, and did not follow them.

4. The mother's engagement during concurrent planning. In January 2022, DCF changed the child's goal from reunification to adoption. Nonetheless, DCF continued to assist the mother to prepare for the possibility of reunification with the child as part of its "concurrent planning." This change triggered resistance from the mother.

In April 2022, the judge reappointed an investigator for an update on the case. The mother informed the investigator that she was being "mentally and emotionally abused by [DCF]," she was not given a chance to learn about the child's medical needs, and she was not being provided with services. Specifically, the mother believed DCF had left her out of the child's medical treatment and already made the decision to "have her adopted," so DCF was not providing "services to help her raise [the child]." At that point, the father was the mother's only support, as she was no longer speaking with the maternal grandmother or engaging with her parent aide.

In 2022, the mother stopped meeting with DCF regularly. The mother also began occasionally refusing home visits. On July 19, 2022, the mother informed her social worker that she was not willing to let DCF see her living space because "if you guys see the room I'm staying in then you guys are going to hold my child from me."

7

In January 2023, a DCF social worker sought to schedule a home visit, but the mother refused unless the goal was changed back to reunification. In between these refusals, as noted above, the mother permitted home visits of her apartment in November 2022 and February 2023. But even then, the mother "made it clear . . . that she felt meeting with [DCF] was not beneficial to her unless her child is to be reunified." In January 2023, the parent aide reported that the mother was unwilling to work with her if the goal was not reunification. After February 2023, the mother refused to meet with DCF altogether unless the child's goal was changed to reunification.

In August 2021, DCF held a permanency planning conference at which DCF determined a need to engage both parents more in the child's medical care. DCF obtained Zoom video links that the mother could use to attend the child's appointments virtually. The mother initially regularly attended those appointments.

Beginning in 2022, after DCF changed the child's goal from reunification to adoption, the mother's participation in the child's appointments began declining as well. After a session in December 2022, the mother reported that she would no longer attend "because [the child] was going up for adoption." The mother attended no further appointments.

By the time of trial in April 2023, despite DCF's

8

considerable efforts, the mother admitted she still did not know all of the child's medical needs and did not know how to meet the child's most basic needs. For example, the child continued to struggle with oral intake of food and required feeding primarily via gastronomy tube (G-tube).[4] The mother admitted she did not know what kind of tube it was and had never fed her with it.

5. Termination of parental rights. On April 15, 2022, DCF filed a motion for review and redetermination[5] and a notice of intent to terminate parental rights. The judge allowed the motion on April 19, 2022, and held a termination trial over the course of three days beginning on April 10, 2023, and ending on May 10, 2023. On May 25, 2023, the judge found the mother and the father unfit and terminated their parental rights.

The judge based his decision to terminate the mother's parental rights on her "lack of consistent and cooperative engagement with DCF, [her] lack of insight into the reasons for [DCF]'s initial involvement and continued concerns, [her] extremely limited understanding of [the child's] complex medical

_____

[4] In January 2021, the G-tube was inserted into the child's stomach because she was unable to obtain sufficient nourishment from oral feedings.

[5] Prior to this, on November 15, 2021, the judge found the mother unfit at a previous trial but had not terminated her parental rights. The mother did not appeal that judgment.

9

needs and the care required to address them, and [her] inability and/or unwillingness to place [the] child's needs above [her] own."

Discussion. 1. Standard of review. "To terminate parental rights to a child and to dispense with consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted). Adoption of Darlene, 99 Mass. App. Ct. 696, 702 (2021). See Adoption of Ilona, 459 Mass. 53, 59 (2011). "Because termination of a parent's rights is an 'extreme step,' a judge must decide both whether the parent is currently unfit and whether, 'on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary.'" Id., quoting Adoption of Carlos, 413 Mass. 339, 350 (1992). "Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary." Adoption of Ilona, supra at 59-60. "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period." Id. at 60. The judge must

measure this in terms of "probabilities rather than possibilities." Adoption of Nicole, 40 Mass. App. Ct. 259, 261 (1996). We keep in mind that, in the context of parental fitness, "[t]he judge who hears the evidence, observes the parties, and is most familiar with the circumstances remains in the best position to make the judgment." Guardianship of Estelle, 70 Mass. App. Ct. 575, 579 (2007).

"We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. at 59. An abuse of discretion occurs only where "the judge made a clear error of judgment in weighing the factors relevant to the decision such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

2. The mother's indefinite unfitness. The mother challenges the judge's finding that her "unfitness will continue undiminished into the future with an attendant harmful effect on [the child]." More specifically, the mother argues that the judge's finding of indefinite unfitness was in error because it was influenced by an erroneous finding that DCF made reasonable efforts to reunify the mother and the child. We disagree.

11

"Before seeking to terminate parental rights, [DCF] must make 'reasonable efforts' aimed at restoring the child to the care of the . . . parents." Adoption of Uday, 91 Mass. App. Ct. 51, 53 (2017), quoting Adoption of Ilona, 459 Mass. at 60. DCF "must match services with needs, and the trial judge must be vigilant to ensure that it does so" (quotations and citations omitted). Adoption of Ilona, supra at 61.

"This duty 'includes a requirement that [DCF] provide services that accommodate the special needs of a parent.'" Adoption of Uday, 91 Mass. App. Ct. at 53, quoting Adoption of Ilona, 459 Mass. at 61. "However, even where [DCF] has failed to meet this obligation, a trial judge must still rule in the child's best interest." Adoption of Uday, supra, quoting Adoption of Ilona, supra. "While courts protect the rights of parents, the parents' rights are secondary to the child's best interests and . . . the proper focus of termination proceedings is the welfare of the child" (quotation and citation omitted). Adoption of Ilona, supra. See Adoption of Inez, 428 Mass. 717, 720 (1999), quoting Care & Protection of Robert, 408 Mass. 52, 62 (1990) ("While parents have a constitutionally recognized interest in maintaining the family unit, a 'child's interest in freedom from neglect or abuse is absolute'"). See also Custody of a Minor, 375 Mass. 733, 749 (1978) (best interests of child paramount consideration where child's well-being at issue).

12

The judge made 377 findings of fact and forty-three conclusions of law.  Ultimately, the judge found that "[DCF] has made reasonable efforts to make it possible for [the child] to be placed in Mother's . . . custody."  The judge found that, despite these efforts, "Mother . . . [is] not able, fit or ready to assume parental responsibility for [the child] and that [the mother] will remain unfit indefinitely."  Having carefully reviewed the record, we discern no clear error in the trial judge's finding that DCF made reasonable efforts to address the mother's unfitness and that the mother remained indefinitely unfit.

Our analysis must begin with the fact that the child was born with profound medical needs.  As noted, the hospital staff tried to provide the mother with the information necessary to care for the child, but the mother never completed the necessary training.  From that point forward, DCF made repeated efforts to help the mother learn how to care for the child.  DCF obtained Zoom links for the mother to attend the child's medical appointments, offered assistance for her to attend visits, helped her engage with a parenting aide, and recommended classes, evaluations, and therapy.  Although the mother took advantage of some DCF resources and completed some tasks on her action plan, she also repeatedly rejected DCF resources designed to improve her fitness to care for the child.  Critically, she

13

never learned how to feed the child through her G-tube and stopped visiting the child for the four months before the termination trial. DCF's obligation to provide services aimed at strengthening the family and reunifying children with their parents is contingent on the parents' willingness to engage in those services and fulfill their parental obligations. See Adoption of Eduardo, 57 Mass. App. Ct. 278, 282 (2003); Adoption of Mario, 43 Mass. App. Ct. 767, 774 (1997).[6]

For these reasons, we discern no clear error in the judge's determination that DCF made reasonable efforts to address the mother's unfitness or that "her unfitness is likely to continue into the indefinite future to a near certitude."

3. The child's best interests. In any event, "a determination that reasonable efforts were not made does not

---

[6] The mother also argues that DCF did not accommodate her disability as required by its own disability policy. Because the mother did not raise this claim at any point prior to the termination trial, it is waived. See Adoption of Gregory, 434 Mass. 117, 124 (2001) ("If a parent believes that [DCF] is not reasonably accommodating a disability, the parent should claim a violation of [her] rights under either the ADA or other antidiscrimination legislation, either when the parenting plan is adopted, when [s]he receives those services, or shortly thereafter"). In any event, DCF did in fact communicate with the mother in multiple modalities, including phone, e-mail, and text, in an effort to accommodate her central auditory processing disability. And again, "even where [DCF] has failed to meet this obligation [to accommodate the special needs of a parent], a trial judge must still rule in the child's best interest." Adoption of Uday, 91 Mass. App. Ct. at 53, quoting Adoption of Ilona, 459 Mass. at 60.

14

preclude . . . even the ultimate termination of parental rights," Care & Protection of Rashida, 489 Mass. 128, 133 (2022), "[b]ecause our lodestar is necessarily the best interests of the child," Adoption of Bea, 97 Mass. App. Ct. 416, 417 (2020).  "[T]he best interests analysis . . . requires a court to focus on the various factors unique to the situation of the [child] for whom it must act."  Custody of a Minor, 375 Mass. 733, 753 (1978).  "The standard for parental unfitness and the standard for termination are not separate and distinct, but 'reflect different degrees of emphasis on the same factors.'"  Adoption of Nancy, 443 Mass. 512, 515 (2005), quoting Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 641 (1975).

The judge found that "[the child]'s best interests would be served by a decree terminating her legal relationship with Mother."  Moreover, he found that "[t]he permanency plan proposed by [DCF] has sufficient content and substance.  It establishes a superior plan for [the child] and it is in her best interests.  [DCF]'s plan is adoption of [the child] by her current pre-adoptive mother. . . .  [DCF]'s plan of adoption by the current, pre-adoptive foster parent represents the best plan for [the child]'s stability and future success."

Having carefully reviewed the record, we are persuaded that the judge acted within his discretion in finding that it was in

15

the child's best interests to terminate the mother's parental rights and approve DCF's plan of adoption, and that the judge's findings of fact in support of that decision were not clearly erroneous.

Again, our analysis must begin with the fact that the child was born with profound medical needs.  The trial judge found that:

> "[The child] has been placed with her current foster mother . . . since she was eleven weeks old and all evidence clearly shows a positive, supportive, and loving parent-child relationship.  Despite [the child]'s extensive medical and developmental needs, [DCF] has never expressed concerns for [the foster mother's] ability or willingness to care for her and she takes [the child] to all of her appointments. [The child] is comfortable in the home and looks to [the foster mother] for affection, engagement, and reassurance.  Most important, [the foster mother] is committed to adopting [the child] and is willing to maintain her connection with Mother as long as it is appropriate.  [The child] is in a safe and stable home environment with [the foster mother], and all evidence indicate[s] that she will be able to meet her present and future needs.  In consideration of the foregoing, forcing [the child] to be placed in [the mother]'s care for the first time would not be in her best interests."

By contrast, the mother's own testimony confirmed that at the time of the termination trial in April 2023, she did not "know anything of what's going on with [the child] medical-wise."  She did not know why the child was in occupational therapy.  She did not know what medical specialists followed the child.  The mother also acknowledged that she had not developed

16

any bond with the child.  She testified that during visits, the child "looks confused.  She looks like she doesn't know who I am."  Nothing in the record suggests any likelihood that these issues would resolve even if DCF provided more services.  Instead, the mother's lack of engagement in the child's medical care supports the judge's conclusion that it was in the best interests of the child to terminate the mother's parental rights.  Contrast Adoption of Chad, 94 Mass. App. Ct. at 840, 840 (judge's findings did not adequately address how termination of parental rights was in children's best interests, where children had "bond and positive relationship" with mother).

Finally, the judge considered the provisions of G. L. c. 210, § 3 (c), and found factors (ii), (iii), (v), (vi), (vii), (viii), (x), and (xii) to be applicable.  The record evidence amply supports the judge's findings and determination that the mother is unfit, that she is likely to remain so indefinitely, and that termination of her parental rights was in the child's best interests.

Decree affirmed.

By the Court (Neyman, Ditkoff & Wood, JJ.[7]),

Clerk

Entered:  March 6, 2025.

---

[7] The panelists are listed in order of seniority.

17