NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-114

ADOPTION OF SIMON.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree issued by a Juvenile Court judge finding the mother unfit and terminating her parental rights to her child, Simon.  See G. L. c. 119, § 26; G. L. c. 210, § 3.  The mother presented as disorganized and dysregulated, had inappropriate visits with Simon and paranoid interactions with others, had persistent housing instability, and demonstrated a lack of understanding of Simon's special needs or her own mental health challenges.  Despite significant mental health diagnoses, she declined to take prescribed medications consistently to manage her mental health even though the medications improved her symptoms.  This evidence provided sufficient support for the judge's determinations.  Accordingly, we affirm.

---

[1] The child's name is a pseudonym.

Background.  1.  Present involvement with the Department of Children and Families (DCF).  Simon was born in June of 2021. His father is not meaningfully involved in his life and has not been a party to these proceedings.  The mother tested positive for marijuana use while she was pregnant in April 2021, but she tested negative in the following month.  Shortly after Simon's birth, DCF received a report pursuant to G. L. c. 51A (51A report) which prompted DCF to complete a G. L. c. 51B investigation.  DCF concluded that the mother's mental health, substance use, and parental capacity required further assessment.  DCF did not take custody of Simon at that time.

In July 2021, DCF received another 51A report alleging that the mother was neglecting the child and acting erratically.  On July 27, 2021, DCF employees conducted an unannounced home visit.  The mother exhibited paranoid thinking, reporting that her neighbors and family members were breaking into her apartment, tampering with baby formula, and hacking her email. DCF employees noted that the mother reported all of these concerns while holding her newborn child in one arm with his head unsupported and hanging down.  At the request of DCF employees, the mother was taken to the hospital for a psychiatric evaluation.  DCF took emergency custody of the five-week-old child that day.

The next day, DCF filed a care and protection petition. On August 3, 2021, DCF was granted temporary custody of the child. Soon afterward, DCF placed the child with the mother's aunt, who is still providing care. The goal of reunification was ultimately changed to adoption in June of 2023 and a trial commenced on August 21, 2024.

2. The mother. The judge's findings reveal that the mother has been diagnosed with bipolar disorder and schizophrenia. Her symptoms include a pattern of paranoia and delusions. She has been hospitalized for mental health concerns roughly five times in the last thirteen years. The mother's most recent hospitalization for psychosis was in May 2021, while she was pregnant with Simon. The mother has been prescribed at least four different psychotropic medications since 2013, but she has struggled to take any of them consistently even though she was observed to exhibit more organized and regulated behavior when she took her medication.

When Simon was born in the summer of 2021, the mother had permanent housing, obtained with a Section 8 housing voucher. The mother lost her Section 8 housing voucher in February 2022. She was homeless and staying with various family members from February 2022 until trial began in August 2024, when she testified that she had just recently secured housing. It

appeared, however that the mother had not yet moved into the new apartment when the trial took place.

A. <u>Engagement with services</u>. 1. <u>Visitation</u>. Initially, from August 2021 to October 2022, the mother regularly attended weekly supervised visits with the child at the placement home. The mother was able to see the child for up to eight hours a week during this time. The placement family expressed some minor concerns about the mother's not being on-time for visits and engaging with the child in age-appropriate ways, but they reported no major concerns to DCF. Two DCF social workers observed positive interactions and noted the mother's progress, but one also noted that the mother became angry at the idea of the child's taking swimming lessons and a visit had to be cut short. Nonetheless, the parent-child visitation was largely successful from August 2021 to October 2022 and the goal remained reunification.

On October 18, 2022, the mother arrived at the maternal aunt's home unannounced and intoxicated, at 2 <u>A</u>.<u>M</u>. The aunt recalled the mother demanding to see the child during this incident. Police responded to the home and escorted the mother away.

After the October 18 incident, the placement family was no longer comfortable with the mother's visits occurring at their

4

home and after a short delay, visits resumed in the DCF office or in the community, supervised by DCF. As time went on, the mother's behavior towards Simon at the DCF-supervised visits became increasingly inconsistent. Her conduct wavered between affectionate and appropriate interactions with Simon and distracted, short-tempered interactions with Simon and with DCF staff. The mother's attendance at visits also declined as time went on. She missed a visit in March 2023 for failure to arrive on time, and another in April 2023 for failure to arrive at all. The mother failed to confirm six visits between October 2023 and February 2024, and all six were cancelled as a result. Between March 2024 and the beginning of the trial in August 2024, however, the mother's attendance at visits improved. DCF reported that the mother missed only one visit during this period.

2. DCF action plans. Beginning in February 2022, DCF provided the mother with various action plans. The judge largely credited DCF's testimony about the mother's failure to complete her action plan tasks -- particularly tasks addressing her parenting capabilities and requirements that she manage her mental health by coordinating with her treatment team and taking prescribed medication.

3.  Mental health treatment and medication compliance.  In the years since Simon was removed from the mother's care, DCF required her to obtain mental health treatment.  Between March and the fall of 2022, the mother attended individual therapy bi-weekly.  Then, after changing health care providers, the mother began seeing another therapist in January 2023.  She consistently met with this same therapist on a weekly or bi-weekly basis until trial in August 2024.  However, the mother never developed a consistent routine meeting with DCF parent aides as required by her DCF action plans, although she did attend some meetings.

The mother has been prescribed various psychotropic medications to treat her mental illness since her diagnosis in 2013, but she has not been willing or able to take them consistently for more than a few months at a time.  From March to June of 2022, the mother was taking her medication as prescribed.  During those months, the mother was able to accurately describe her diagnosis and take ownership of her mental health issues.  She also demonstrated more organized and regulated behavior and her interactions with Simon were positive.  When the mother stopped taking her medication in June 2022, her therapist witnessed her presentation declining.  The mother's behavior at trial in the fall of 2024 was extremely

dysregulated and erratic, and she testified that she had not been taking any medication that summer. The mother also repeatedly became agitated when service providers brought up medication during their appointments.

The mother has claimed that her bipolar disorder is asymptomatic and does not require medication. She has also expressed resentment towards DCF for requiring medication compliance as a part of treatment. The mother has not clearly articulated an explanation for her resistance to taking medication, but she has mentioned experiencing side effects like weight gain and increased heart rate in the past. The mother believes that the people around her, especially her family, make her mental health worse, and that medication will not solve that. Ultimately, the mother's position is that she does not require psychotropic medication to manage her illness.

3. Simon's progress. Simon is now over four years old and has been living with the maternal aunt since August 2021. Simon participated in early intervention services based on speech development concerns and was diagnosed with autism in 2023. The mother is aware of this diagnosis but does not necessarily agree with it, and she would prefer to seek a second opinion. Simon has also been diagnosed with the sickle-cell trait, which the mother does not believe is possible.

Simon has developed a very strong bond with the maternal aunt since being placed in her home.  Simon has access to a large extended family through this kinship placement, and the maternal aunt has created a consistent routine that meets Simon's needs.  The placement home has a bedroom for Simon with a toddler bed and age-appropriate toys, including sensory toys specifically beneficial for autistic children.  DCF workers have confirmed that Simon is safe and well cared for, and that the placement home is clean and baby proofed.

4. <u>Termination of parental rights</u>.  After a trial in the fall of 2024, and for the reasons described above, the judge found the mother unfit to parent her child.  Furthermore, the judge determined that it was in Simon's best interests to terminate the mother's parental rights.  The judge also decided not to order posttermination visitation for the mother and left that choice up to the discretion of the adoptive parent, the mother's aunt.[2]

---

[2] Because the mother did not address the issue of posttermination visitation orders in her written brief, we do not consider it on appeal.  See Board of Registration in Med. v. Doe, 457 Mass. 738, 743 n.12 (2010) (argument not made in brief but raised for first time at oral argument is waived).  See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).

Discussion.  1.  Standard of review.  "To terminate parental rights to a child and to dispense with consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted).  Adoption of Darlene, 99 Mass. App. Ct. 696, 702 (2021).  See Adoption of Ilona, 459 Mass. 53, 59 (2011).  "Because termination of a parent's rights is an 'extreme step,'. . . a judge must decide both whether the parent is currently unfit and whether . . . 'there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary'" (citations omitted).  Adoption of Ilona, supra at 59.  "Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary."  Id. at 59-60.[3]  We recognize that, in the context of parental fitness, the "judge who hears the evidence, observes

---

[3] The mother does not explicitly address the judge's finding that her unfitness is likely indefinite in her written brief. Accordingly, we do not address this issue further.  See Board of Reg. in Med., 457 Mass. at 743 n.12.  Mass. R. A. P. 16 (a) (9) (A).

the parties, and is most familiar with the circumstances remains in the best position to make the judgment [regarding fitness]." Adoption of Lisette, 93 Mass. App. Ct. 284, 292 (2018), quoting Guardianship of Estelle, 70 Mass. App. Ct. 575, 579 (2007).

"We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. at 59. An abuse of discretion occurs only where "the judge made a clear error of judgment in weighing the factors relevant to the decision such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

2. The mother's unfitness. We review the judge's decision to assess whether the mother's unfitness was, in fact, supported by clear and convincing evidence. See Adoption of Darlene, 99 Mass. App. Ct. at 702-703. When making such a determination, the judge must "make specific and detailed findings demonstrating that close attention had been given [to] the evidence." Adoption of Leland, 65 Mass. App. Ct. 580, 583 (2006). A finding of unfitness is "not a moral judgment or a determination that the mother. . . [does] not love the child"

10

(citations omitted). Adoption of Bea, 97 Mass. App. Ct. 416, 417 n.2 (2020). Rather, "parental unfitness means grievous shortcomings or handicaps that put the child's welfare much at hazard" (quotations and citations omitted). Adoption of Jacob, 99 Mass. App. Ct. 258, 262 (2021).

In ascertaining parental fitness, the judge "may consider past conduct to predict future ability and performance." (quotation and citation omitted). Adoption of Jacob, 99 Mass. App. Ct. at 262. A parent's mental disorder is relevant only "to the extent that it affects the [parent's] capacity to assume parental responsibility, and ability to deal with a child's special needs" (quotations and citations omitted). Adoption of Luc, 484 Mass. 139, 146 (2020). "A parent may be found unfit because of mental deficiencies, but only where it is shown that such 'deficiencies impair[] her ability to protect and care for the child[].'" Adoption of Chad, 94 Mass. App. Ct. 828, 838 (2019), quoting Adoption of Quentin, 424 Mass. 882, 888-889 (1997).

In the present case, after a six-day trial, the judge made 144 findings of fact and twenty-eight conclusions of law. In his lengthy findings, he demonstrated the close attention he had given to the evidence. See Adoption of Quentin, 424 Mass. at 886. The judge was properly concerned about the mother's

11

inability to understand the effect that her unmedicated mental illness has on her ability to parent. Despite the fact that the mother consistently engaged in individual therapy for much of the period leading up to trial, she continually refused to follow medical recommendations to manage her bipolar disorder. See Adoption of Luc, 484 Mass. at 147 (mother's "unwillingness to adhere to DCF service plan, which required her to obtain treatment for her mental health challenges . . . is relevant to the determination of unfitness" [quotation and citation omitted]). Her noncompliance with medication was of particular concern to the judge, especially given her erratic and dysregulated behavior at trial as evidenced by her unresponsive and meandering answers to questions.

Beyond issues of temperament, the judge focused on the mother's lack of insight into how her own behavior and illness led to the child's removal. The judge properly weighed (1) the impact of the mother's mental illness on her ability to parent the child, and (2) her past behavior as a predictor of her future parenting ability. See Adoption of Luc, 484 Mass. at 146; Adoption of Jacob, 99 Mass. App. Ct. at 262. Here, there was sufficient analysis of the nexus between the mother's parenting ability and her mental illness.

Furthermore, the judge thoroughly considered the mother's inconsistent engagement with DCF services and difficulty interacting with Simon in age-appropriate ways. We recognize that, before October 2022, and again between March and August 2024, the mother was reliable in attending visitation, especially considering that she was homeless at the time. Despite that success, the mother's life lacks stability, and her behavior at visits with Simon was sometimes unpredictable and volatile. Simon also has special needs that the mother does not seem to fully understand or recognize. The judge found that the mother's engagement in individual therapy and parenting classes, though commendable, did not translate into an ability to improve her parenting skills or ability to care for Simon. And finally, Simon's needs are being met by the pre-adoptive family placement. The judge properly considered the relevant factors in his overall determination that the mother is unfit to parent Simon.

For these reasons, we discern no clear error in the judge's determination that the mother is unfit and that "her unfitness is likely to continue into the indefinite future to a near certitude."

3. The child's best interests. The record likewise supports the judge's findings and ultimate conclusion that the

13

termination of the mother's rights was in [Simon's] best interests. See Adoption of Yalena, 100 Mass. App. Ct. 542, 533 (2021). "[T]he best interests analysis . . . requires a court to focus on the various factors unique to the situation of the [child] for whom it must act." Custody of a Minor, 375 Mass. 733, 753 (1978). "The standard for parental unfitness and the standard for termination are not separate and distinct, but 'reflect different degrees of emphasis on the same factors.'" Adoption of Nancy, 443 Mass. 512, 515 (2005), quoting Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 641 (1975). "In determining whether the best interests of the children will be served by issuing a decree dispensing with the need for consent, a 'court shall consider the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility and shall also consider the plan proposed by the department or other agency initiating the petition.'" Adoption of Nancy, 443 Mass. at 515-516, quoting G. L. c. 210, § 3 (c).

The judge found that the mother "is presently unfit to assume parental responsibility for the subject child"; that her unfitness is "likely to continue"; and that the child's best interests "would be best served by the termination of parental rights of [the mother]." This decision was based on his

14

thorough review of record evidence of the mother's ability and capacity to parent Simon.  The judge also properly considered Simon's interests in remaining with the preadoptive family, who, he found, have been effectively, safely, and successfully parenting Simon since infancy.  The judge found that there is a significant relationship between Simon and the preadoptive placement, and no such relationship between the child and the mother.  The judge found that Simon's special needs are also currently being met, and the judge was justifiably concerned about whether the mother would be willing or able to provide an appropriate level of care to meet his special needs.  All of these findings are well supported by the evidence and we perceive no clear error or abuse of discretion.

Finally, the judge considered the provisions of G. L. c. 210, § 3 (c), and found factors (ii), (iii), (v), (vi), (vii), (viii), and (xii) to be applicable.  We discern no clear error or abuse of discretion in the judge's analysis of the relevant factors.  The record evidence provides clear support for the judge's findings and determination that the mother is unfit, that she is likely to remain so indefinitely, and that

15

termination of her parental rights was in Simon's best interests.

Decree affirmed.

By the Court (Ditkoff, D'Angelo & Wood, JJ.[4]),

Clerk

Entered:  November 21, 2025.

---

[4] The panelists are listed in order of seniority.